NO. 4-06-0808        Filed 11/6/07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Champaign County |
| JERRI M. KENTON, | ) | No. 04CF2083 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

Jerri M. Kenton, age 35, pleaded guilty to unlawful restraint (720 ILCS 5/10-3 (West 2006)), a Class 4 felony. The trial court sentenced Kenton to 30 months' probation. The trial court subsequently granted the State's motion to revoke probation and resentenced Kenton to 22 months' imprisonment. Kenton appeals, arguing that the trial court abused its discretion in sentencing her to prison rather than ordering mental-health treatment. We affirm.

I. BACKGROUND

A. Underlying Offense

On November 11, 2004, Kenton, who has been suffering from mental illness for over 20 years, asked her mother, Barbara Tomscha, for a blank check. Kenton claimed she wanted the check to buy cigarettes at the convenience store. Tomscha declined. Kenton refused to take no for an answer and blocked the doorway.

Tomscha looked around the room for a phone and Kenton stated, "What are you going to do this time, call the FBI on me?" Kenton then pushed Tomscha to the ground and said, "On your knees, bitch." Kenton made Tomscha recite The Lord's Prayer. Tomscha was ultimately able to escape to her car and drive away.

Tomscha reported the incident to the police and told them that her daughter needed help. Tomscha felt it was unsafe for Kenton to continue to live with her and worried that if things escalated any further, Kenton would do something to get herself into real trouble. Tomscha hoped that the justice system would somehow be able to control Kenton's treatment. The State charged Kenton with unlawful restraint, and the court-ordered psychiatrist, Dr. Lawrence Jeckel, found Kenton fit to stand trial or to plead. Kenton pleaded guilty and, in the same hearing, was sentenced to 30 months' probation. The record does not contain a presentence report. The court also ordered Kenton to obtain a mental-health and substance-abuse evaluation within 60 days. The court ended the hearing with a final admonishment:

> "Ms. Kenton, Dr. Jeckel said there's nothing wrong with you. I think you're spoiled. You either do what I've told you to do *** or [the State] is going to file a petition to revoke your probation. If [the State] proves it, I'll send you to prison and they don't

- 2 -

have counselors in prison. They just have jailers, and they'll lock you up."

### B. Revocation of Probation

On November 12, 2005, Kenton went to a grocery store parking lot and tried to open the doors of several parked cars. At one, she reached into a car window and pulled out a beer. As the owner of the car approached her, Kenton threw the beer on the ground and attacked him. The owner of the car then ran back inside the store and reported the incident to customer service. The manager of the store immediately went outside to assess the situation. The manager asked Kenton for her version of the incident. Kenton then attacked the manager. The manager was able to fend off Kenton's blows and bring her to the ground. Because he knew that the police had already been called, the manager then let Kenton get up and run away. Kenton later reported that she had been drinking vodka immediately prior to the incident.

The State subsequently filed a petition to revoke probation, alleging that Kenton violated the terms of her probation by committing a battery (720 ILCS 5/12-3(a)(2) (West 2004)) in that she knowingly and without legal justification made physical contact of an insulting or provoking nature. Kenton admitted said allegation at the revocation hearing.

Kenton presented extensive evidence regarding her

mental-health history at the revocation hearing. Tomscha, who has a master's degree from the University of Illinois and who recently retired after 34 years of teaching, wrote the court a five-page letter detailing Kenton's mental-health history. Tomscha stated that Kenton was a delightful child who got straight "A's," attended music camp at the University of Illinois, and had many friends. Suddenly, at age 14, Kenton began behaving erratically. Kenton believed that the government was stealing her thoughts. Kenton's friends became afraid of her. At age 15, Kenton was arrested for hitting another girl. Kenton was later diagnosed with schizophrenia and was sent to a state mental-health facility for one year. Kenton eventually returned home but her behavior was still erratic. For example, Kenton attacked Tomscha because she thought the underside of her tongue looked funny and she thought Tomscha had done something to it. Kenton dropped out of high school. It took Kenton's doctor, John Gergen, several years and several different prescription combinations before he was finally able to stabilize Kenton's condition.

Then, from ages 18 to 28, Kenton was fairly productive. Kenton received $567 per month from social security for her disability. Kenton took classes at Parkland Community College, lived away from home in an apartment, handled her own finances, and made friends. Kenton had a good relationship with her family during this time, coming home every Friday night for pizza and

- 4 -

joining her grandmother for lunch every Sunday.  It seems as though the only significant worry during this time period was that the medication that helped Kenton stabilize her behavior also caused a profound weight gain.

Unfortunately, after treating Kenton for many years, Dr. Gergen retired.  Kenton began seeing Dr. Luke Yang at the Mental Health Center (MHC).  Dr. Lang thought that Dr. Gergen had Kenton on too much medication.  He changed Kenton's diagnosis from schizophrenia to bipolar disorder and changed her prescription accordingly.  Kenton began to fall apart.  Kenton stopped coming home on Friday evenings.  Kenton self-medicated with alcohol and nicotine and developed an addiction.  MHC removed Kenton from her apartment for fear that she would burn it down.  MHC put Kenton up in a hotel of dubious safety.  When Tomscha came to visit, she noticed that Kenton often looked unkempt and did not have proper clothing.  Kenton grew more symptomatic and paranoid.  It was difficult for Tomscha to find a treatment facility for Kenton that was equipped to treat both severe mental illness and alcohol dependency.  Frustrated with the lack of living arrangements for Kenton, Tomscha invited Kenton to come back home.

Kenton lived with Tomscha for approximately two years prior to the precipitating incident in this case.  MHC was not happy with this arrangement because it thought Kenton would hurt

Tomscha. Many troubling incidents occurred during this time. Kenton once suffered from frostbite after going outside without proper clothing. Kenton went outside because she was afraid the house was going to burn down after a lightbulb burnt out. Kenton used a yard rake to destroy a love seat and chair because she was afraid of the furniture. Kenton kicked a hole in Tomscha's bedroom door and gave away or lost many household items. Kenton could not remember what she did with the household items and thought that maybe Dr. Gergen had them.

Tomscha further reported that Kenton has poor judgment with her peers. Kenton once accepted a ride from a stranger who took her out in the country and dumped her. In regard to that incident, Tomscha stated, "heaven only knows what else happened to her." Kenton has slept outside in parks and has been mugged several times. Tomscha is afraid to live with Kenton any longer, but she does not believe Kenton should be punished. Tomscha asked the court for help in providing treatment for Kenton.

The presentence report recapped Kenton's behavior following the commencement of her probation period. On March 29, 2005, Kenton obtained a substance-abuse evaluation from the Prairie Center, which recommended intensive outpatient treatment. On June 14, 2005, the Prairie Center discharged Kenton for lack of participation. On September 2, 2005, the Prairie Center reassessed Kenton and recommended residential treatment. Kenton

was scheduled to begin residential treatment on October 5, 2005. However, for reasons not clear from the record, on October 7, 2005, Kenton was asked to leave the Prairie Center. Kenton admitted that she used alcohol during her probation period, but test results were negative for any controlled or illegal substances.

Also according to the presentence report, Kenton began seeing a private psychiatrist, Dr. David Kopacz. Dr. Kopacz treated Kenton from February 11, 2005, to December 9, 2005, ultimately terminating Kenton's treatment due to several noncompliance issues such as drinking, not taking medication, and threatening Tomscha. Specifically, Kenton threatened to cut off Tomscha's arm and leg. Dr. Kopacz thought Kenton's "motivation for treatment [was] very low." Dr. Kopacz also thought it would be dangerous for Kenton to continue to live with Tomscha.

Jennifer Crites, who authored the presentence report, stated that she attempted to contact different residential agencies to see what criteria an applicant must meet in order to be placed in a residential facility that provided mental services. Crites had a difficult time finding a facility that would treat both Kenton's mental problems and her substance-abuse problems. Crites gave Kenton two applications to fill out for a facility in Brown County, but it seems that Kenton lost both applications.

On January 24, 2006, MHC of Champaign County, a community-based treatment provider, assessed Kenton. Kenton had been receiving services from MHC for nearly 20 years and had been either noncompliant or not fully engaged with the services offered to her by MHC and other community providers. MHC did not believe that community-based treatment would be effective in stabilizing Kenton, especially due to her denial for the need of services. MHC recommended that Kenton receive a forensic psychiatric evaluation in order to determine her fitness to stand trial and to determine what treatment might be necessary to stabilize her.

Dr. Jeckel performed a second psychiatric evaluation and determined that Kenton was fit to stand before the court and was criminally responsible at the time of her offense. However, Dr. Jeckel stated that Kenton suffered from some sort of chronic schizophrenic illness, most likely schizoaffective disorder. Dr. Jeckel noted that Kenton had been diagnosed in the past with schizophrenia, bipolar affective disorder, borderline personality disorder, and alcohol abuse. Dr. Jeckel opined that, ideally, Kenton should be sent to an inpatient treatment center such as McFarland Mental Health Center where her underlying psychosis could be adequately treated with "I.M. depot antipsychotic medication." After Kenton stabilized through inpatient treatment, she could be released for community-based, outpatient

treatment. Dr. Jeckel thought that it would be very difficult for a private psychiatrist to handle a patient as complex as Kenton and thought that Kenton would need a team of treatment providers, including a psychiatrist, a crisis worker, a case-worker, and an alcohol-abuse counselor. Even if Kenton were eventually released into the community, she still would most likely need periodic hospitalization. Dr. Jeckel further recommended that the probation office, in conjunction with MHC, set up a plan where failure to comply with court-ordered psychological treatment would lead to law-enforcement intervention and/or civil commitment.

In making its sentencing recommendation, the State opined that "it [was] readily apparent that [Kenton] has had trouble and difficulty on probation in large part due to un-treated *** mental illness." The State informed the court that, in consideration of Kenton's record, being sentenced to the Department of Corrections (DOC), while always an option in felony cases, may not be the most appropriate sentence here. The State conceded that it had "no particular recommendation" for sentencing but suggested that if the court wanted to retain substantial interest in the case, it could order a community-based sentence involving jail time and/or commitment to a facility such as McFarland. Defense counsel requested another shot at probation conditioned on a community-based treatment plan.

The trial court stated that there did not appear to be a "good solution" to resolve Kenton's case. The court did not believe it had jurisdiction to order Kenton to be treated at McFarland because Dr. Jeckel found her to be fit to stand trial and criminally responsible for her crime. Further, no one filed a petition for involuntary commitment. Any person 18 years of age or older may present a petition to the facility director of the mental-health facility in the county where the respondent resides or is present as provided in section 3-600 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-600 (West 2004)). The petition shall comply with the requirements of section 3-601, including a detailed statement of the reason for the assertion that the respondent is subject to involuntary admission, contact information of close relatives and/or guardians, the petitioner's relationship to the respondent, and contact information of witnesses. 405 ILCS 5/3-601 (West 2004). The petition shall be accompanied by the appropriate certification from authorized personnel. 405 ILCS 5/3-601.1, 3-602 (West 2004). Assuming the petition, examinations, and certifications are in compliance with the requirements of the Mental Health Code, the case would proceed to hearing wherein the respondent could be involuntarily committed. 405 ILCS 5/3-700, 3-701, 3-800, 3-801 (West 2004).

On the other hand, Kenton was virtually nonresponsive

to community-based treatment, and therefore probation was not an option.  The trial court believed Kenton to be truly dangerous, "a time bomb waiting to go off."  The court considered Kenton's situation "very sad" and even stated that she was "fall[ing] through the cracks of the criminal[-]justice system."  However, given the options available to the court, it believed 22 months' imprisonment in DOC would be the most appropriate sentence.  The trial court denied Kenton's motion to reconsider sentence, stating that it had "fashioned a sentence that hopefully would get Kenton motivated to deal with the substance[-]abuse issues that she has, and also get her back into some form of mental[-]health treatment."  This appeal followed.

## II. ANALYSIS

Kenton argues that the trial court abused its discretion when it sentenced Kenton to DOC when Kenton actually needed mental-health treatment.  Specifically, Kenton argues that she should have received a sentence of probation with the condition that she receive outpatient mental-health counseling.  We disagree.

Generally, a trial court has great discretion to fashion an appropriate sentence within the statutory limits. People v. Fern, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). An abuse of discretion may be found even if the sentence is within the statutory limitations if the sentence is greatly at

variance with the purpose and spirit of the law.  People v.

Steffens, 131 Ill. App. 3d 141, 152, 475 N.E.2d 606, 615 (1985).

In addition to the statutory factors in aggravation and mitiga-

tion, the trial court should base its decision on the particular

circumstances of each case, including the defendant's credibil-

ity, demeanor, general moral character, mentality, social envi-

ronment, habits, and age.  Fern, 189 Ill. 2d at 53, 723 N.E.2d at

209.  Because the trial court is in a better position to observe

the witnesses and consider the relevant factors, its sentencing

determination is entitled to great deference.  Fern, 189 Ill. 2d

at 53, 723 N.E.2d at 209.  We will not substitute our judgment

for that of the trial court simply because we would have weighed

the sentencing factors differently.  Fern, 189 Ill. 2d at 53, 723

N.E.2d at 209.

        The sentencing range for unlawful restraint, a Class 4

felony, is one to three years' imprisonment.  730 ILCS 5/5-8-

1(a)(7) (West 2004).  Probation is a privilege to be employed

when a "'defendant's continued presence in society would not be

threatening and the defendant's rehabilitation would be en-

hanced.'"  People v. Neckopulos, 284 Ill. App. 3d 660, 663, 672

N.E.2d 757, 760 (1996), quoting People v. Allegri, 109 Ill. 2d

309, 314, 487 N.E.2d 606, 607 (1985).  Here, Kenton was clearly a

threat to the public.  The trial court reasonably feared that

Kenton would seriously injure someone.  Even those experts who

advocated inpatient treatment over incarceration did not believe Kenton was a good candidate to be released on probation for community-based treatment. Kenton has not cooperated with the outpatient services offered to her in the past. It is doubtful that Kenton's rehabilitation would be enhanced by probation or by any treatment short of commitment at a facility like McFarland.

Kenton cites People v. Carter, 165 Ill. App. 3d 169, 518 N.E.2d 1068 (1988), and People v. Hamelin, 181 Ill. App. 3d 350, 537 N.E.2d 3 (1989), for the proposition that it was error for the trial court to revoke probation where Kenton had not yet had the chance to participate in the recommended inpatient rehabilitation program. In Carter and Hamelin, the trial court abused its discretion when it revoked the rehabilitative sentence originally ordered as a condition of probation before the defendant had the opportunity to participate in the relevant rehabilitation program. Carter, 165 Ill. App. 3d at 175-76, 518 N.E.2d at 1071-72; Hamelin, 181 Ill. App. 3d at 354, 537 N.E.2d at 6. The instant case is distinguishable. Unlike the defendants in Carter and Hamelin, Kenton was able to begin the outpatient rehabilitative treatment originally prescribed to her as a condition of her probation. It was not until more extensive psychological reports were presented to the trial court at the revocation proceeding that the recommendation for inpatient treatment was made.

- 13 -

The result in this case is unfortunate because all of the psychological experts seem to agree at this point that the ideal placement for Kenton would have been inpatient treatment at a facility like McFarland, rather than DOC. Even the State recommended such a result. The trial court, it seems, felt it had its hands tied, believing that it could not order Kenton to be treated at McFarland because Kenton was fit to stand trial, was criminally responsible for her crime, and no one had filed a petition for involuntary commitment pursuant to the Mental Health Code (405 ILCS 5/3-700, 3-701 (West 2004)).

Typically, a person is subject to involuntary admission if she has a mental illness and, because of her illness, is reasonably expected to inflict serious physical harm upon herself or another in the near future or is unable to provide for her basic physical needs so as to guard herself from serious harm. 405 ILCS 5/1-119(1), (2) (West 2004) (subsequently amended by Pub. Act 95-602 (eff. June 1, 2008)). However, "[w]hen a person is charged with a felony he comes within the authority of the criminal[-]justice system of the State. If such a person is subsequently found to be in need of mental treatment, and yet fit to stand trial, a determination must be made as to whether that person shall remain under the authority of the criminal[-]justice system, or, alternatively, be transferred to the jurisdiction of the mental[-] health[-]system." People v. Zahn, 71 Ill. App. 3d

585, 589, 390 N.E.2d 93, 96 (1979).

The legislature has addressed the problem of defendants who may potentially fall under the jurisdiction of both the criminal-justice system and the mental-health system, stating that a trial court has jurisdiction under chapter III of the Mental Health Code, which governs the admission, transfer, and discharge procedures for the mentally ill, only:

"over [those] persons not charged with a felony who are subject to involuntary admission. Inmates of penal institutions shall not be considered as charged with a felony within the meaning of this [c]hapter. Court proceedings under [a]rticle VIII of this [c]hapter may be instituted as to any such inmate at any time within 90 days prior to discharge of such inmate by expiration of sentence or otherwise, and if such inmate is found to be subject to involuntary admission, the order of the court ordering hospitalization or other disposition shall become effective at the time of discharge of the inmate from penal custody."  (Emphasis added.) 405 ILCS 5/3-100 (West 2004).

See also In re Jill R., 336 Ill. App. 3d 956, 961, 785 N.E.2d 46,

- 15 -

50 (2003).

There are, however, some unique circumstances where mentally ill persons charged with a felony may come solely under the authority of the mental-health system, if only temporarily. Zahn, 71 Ill. App. 3d at 589, 390 N.E.2d at 96. For instance, defendants who have been adjudicated unfit to stand trial are, at least temporarily, removed from the jurisdiction of the criminal-justice system and may come under the authority of the mental-health system either as voluntary or involuntary commitments. Zahn, 71 Ill. App. 3d at 589, 390 N.E.2d at 96. Additionally, defendants acquitted of felonies by reason of insanity have been completely removed from the jurisdiction of the corrections system by virtue of their acquittals. Zahn, 71 Ill. App. 3d at 589, 390 N.E.2d at 96. Even those defendants who have been adjudicated fit for trial may voluntarily avail themselves to treatment under the Mental Health Code while out on bond. Zahn, 71 Ill. App. 3d at 589, 390 N.E.2d at 96. Finally, those who are ultimately convicted of a felony and subsequently transferred from the penitentiary to the Department of Mental Health are also temporarily removed from the authority of DOC. Zahn, 71 Ill. App. 3d at 589, 390 N.E.2d at 96. Presumably, defendants charged with felonies in all other situations remain under the jurisdiction of the criminal-court system.

The trial court was then without the authority to

- 16 -

directly order Kenton to obtain inpatient treatment at McFarland. Under the appropriate circumstances, however, DOC may now transfer Kenton to the Department of Mental Health under section 3-8-5 of the Unified Code of Corrections (730 ILCS 5/3-8-5(a), (c), (d) (West 2004). Under that section, if DOC determines Kenton to be a person subject to involuntary admission under section 1-119 of the Mental Health Code, then Kenton need only consent and she may be treated at a facility such as McFarland for a period not to exceed six months. 730 ILCS 5/3-8-5(a) (West 2004). If Kenton does not consent, and if the commitment exceeds six months, or if the period of commitment exceeds the length of the Kenton's sentence, DOC shall file a petition for involuntary commitment in the trial court. 730 ILCS 5/3-8-5(c) (West 2004). The court may commit the person to the Department of Mental Health following a hearing on DOC's petition. 730 ILCS 5/3-8-5(d) (West 2004).

Perhaps if the trial court had sentenced Kenton to probation, it could have ordered a temporary detention and examination under section 3-607 of the Mental Health Code, thereby initiating the process by which Kenton might be involuntarily committed in an independent proceeding in another courtroom. See 405 ILCS 5/3-607 (West 2004). Section 3-607 states:

> "When, as a result of personal observation
> and testimony in open court, any court has
> reasonable grounds to believe that a person

appearing before it is subject to involuntary admission and in need of immediate hospitalization to protect such person or others from physical harm, the court may enter an order for the temporary detention and examination of such person.  ***  If a petition and certificate, as provided in this [a]rticle, are executed within 24 hours, the person may be admitted and the provisions of this [a]rticle shall apply.  If no petition or certificate is executed, the person shall be released."

405 ILCS 5/3-607 (West 2004).

Of course, even if initiating involuntary-commitment procedures was an option for the trial court, it may not have wanted to take the chance that Kenton would end up back on the streets sooner than it would have liked.

### III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's judgment.  As part of our judgment, we grant the State its statutory assessment of $50 against defendant as costs of this appeal.

Affirmed.

KNECHT and TURNER, JJ., concur.

- 18 -