NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180059-U

NO. 4-18-0059

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 31, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| JOHN A. MARTINEAU, | ) | No. 17CF317 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Amy C. Lannerd, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Steigmann and Justice Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed defendant's conviction for home invasion, finding even though defense counsel's performance was deficient, defendant was unable to establish "prejudice" under the second prong of *Strickland v. Washington*, 466 U.S. 668 (1984), and the 20-year sentence imposed by the trial court was not an abuse of discretion.

¶ 2    In April 2017, defendant, John A. Martineau, was charged with two counts of home invasion (720 ILCS 5/19-6(a)(1), (3) (West 2016)). The first count alleged he, without authority, entered the dwelling belonging to Ricky Liesen, having reason to know one or more persons was inside, while armed with a dangerous weapon other than a firearm and either used force or threatened the use of force upon the victim. Count I is a non-probationable Class X felony punishable by 6 to 30 years in prison. 720 ILCS 5/19-6(c) (West 2016). The second count alleged the same acts, except it claimed defendant was armed with a firearm. This count is also a

Class X felony subject to the same punishment, but "15 years shall be added to the term of imprisonment by the court." 720 ILCS 5/19-6(c) (West 2016).

¶ 3        In September 2017, a jury found defendant guilty of count I, home invasion with a dangerous weapon other than a firearm, and acquitted him on count II, home invasion while armed with a firearm. In January 2018, the trial court sentenced defendant to 20 years in the Illinois Department of Corrections. On appeal, defendant argues defense counsel was ineffective for failing to redact portions of defendant's taped police interview before it was published to the jury and his 20-year sentence to the Illinois Department of Corrections was excessive. We affirm.

¶ 4                                I. BACKGROUND

¶ 5                             A. Pretrial Proceedings

¶ 6        At a pretrial hearing in June 2017, defense counsel announced she was ready for trial but also indicated she had not received a copy of defendant's recorded interview and jail phone calls and requested the State to tender these items via discovery. The State responded by noting the videos were referenced in the reports previously provided to defense counsel and further noted this was the first request by the defense to review them. At the pretrial conference in July 2017, both parties agreed to continue the trial to August because the knife taken as evidence was still at the crime lab, awaiting fingerprint testing. In August 2017, both parties agreed to another continuance until September.

¶ 7        On the morning of trial, defendant filed a motion *in limine* requesting the State be prohibited from impeaching defendant via two of his previous felony convictions. The State agreed not to use one of the previous felony convictions as the conviction was more than 10 years old, but it argued his other felony conviction was properly available for impeachment

should defendant elect to testify on his own behalf. The trial court found the State could use the remaining conviction for impeachment purposes only.

¶ 8                                    B. Jury Trial

¶ 9                                    1. *Ricky Liesen*

¶ 10        The State, without objection from defense counsel, admitted the 911 recording of Ricky Liesen and then published it to the jury. During the recording, Liesen tells the operator defendant was just in his house, attempting to kill him. He said defendant "had a gun in my mouth and a switchblade cut my face." Liesen testified that on the day of the incident, he returned home and left his garage door open, went inside, and shortly thereafter heard a knock at the door from the garage. He opened it and found defendant, who had entered his garage uninvited. When Liesen opened the interior solid door, he found defendant had already opened the screen door. Defendant then walked past Liesen, uninvited, and entered the kitchen. Liesen said he did not immediately tell defendant to leave because he was "shocked." Defendant then said something about being sorry to have to bring up "old times" and slapped him across the face without warning, pulled out a gun, and asked if Liesen was "ready to die?" After forcing the barrel of the gun into Liesen's mouth, he eventually put the gun away, pulled out a knife, and ran the blade along both sides of Liesen's neck and cheeks before jamming the blade of the knife into the door of a kitchen cabinet. Defendant blamed Liesen for getting him "thrown in jail" "from another incident." In an effort to escape, Liesen said he needed to let his dog out. When he began to go down the steps into his garage, Liesen said defendant told him he was "going to blow a hole in the back of [Liesen's] head" if he did. Despite the threat, Liesen exited through his garage, where he saw his neighbor, Ken Brady. Defendant followed and approached Liesen before Brady intervened. After questioning why his friend, Liesen, had blood on his face, Brady

told defendant he should leave. After a brief confrontation where defendant began to approach Brady, who stopped him with a hand to his chest, defendant left. The State then introduced several photographs into evidence, including pictures of Liesen's injuries, a picture of the knife stuck in his kitchen cabinet, and pictures of the victim's yard where defendant had driven into the yard rather than the driveway when he first arrived. Liesen also identified a pair of sunglasses and a beer can with an insulated cover defendant left behind in Liesen's kitchen.

¶ 11        During the State's direct examination, the trial court had to call a brief recess. Taking counsel and defendant into his chambers and outside the presence of the jury, the court advised counsel, "[Defendant] is repeatedly nodding his head and shaking his head" as Liesen was testifying. The court indicated, "He is deliberately looking at the jury, it appears to me, and making fairly notable nods and head shakes as we go through this." The court indicated it wanted to bring the matter to counsels' attention so it could be addressed. Neither counsel commented, and it apparently was no longer an issue throughout the rest of the trial since the court did not address it again.

¶ 12                           2. *Ken Brady*

¶ 13        Ken Brady testified he was neighbors with Liesen and was working outside on the date of the incident. Liesen arrived home, and he spoke with Brady for about five minutes while standing outside. Brady testified he saw no cuts or abrasions on Liesen's face at that time and Liesen appeared to have a calm, normal demeanor. After Liesen went inside his home, Brady saw a car, later identified as defendant's, drive "relatively fast" as it drove onto the grass in front of Liesen's house and parked. Brady testified the vehicle parked on the grass even though the driveway was large enough for several cars. He saw defendant get out of the car, walk quickly into the open garage, and head toward the door. He stated that after approximately five minutes,

Liesen walked out of the garage, followed by defendant. According to Brady, Liesen now had blood on his face and neck. Brady also said he saw defendant "bear hug" him and that he could tell Liesen was "very upset at that point." Brady said, as he approached, he could see Liesen's face was red, that he had blood on his face and neck, and that he was crying. After questioning defendant about Liesen's face, Brady told defendant to leave. He said defendant stepped toward him, at which time "I put three fingers in his sternum and told him he needed to leave." Defendant eventually left, and Liesen immediately got on his phone and called the police.

¶ 14                                3. *Deputy Dave Mason*

¶ 15            Deputy Dave Mason, a 17-year veteran of the Adams County Sheriff's Office, testified he was dispatched to Liesen's house shortly after the incident to investigate a report of a "disturbance" involving "a subject with a gun and a switchblade." When he arrived, he saw Liesen and Brady standing outside. Liesen appeared to be upset and looked like he had been crying. His cheeks and forehead were red, and he had blood on him. Deputy Mason identified as exhibits the photos he took of Liesen's injuries and of the scene. Upon entering Liesen's home, he found a black-handled knife with an approximately six-inch blade "physically imbedded" in a kitchen cabinet door and explained the procedure he used to collect the knife as evidence.

¶ 16                                4. *Investigator Jake McMahon*

¶ 17            Investigator Jake McMahon, who had been with the Adams County Sheriff's Office for six years, went to defendant's home as part of his investigation to speak to defendant about a reported home invasion involving a gun and a knife. He did not locate a firearm in or around defendant's home before bringing him to the sheriff's office for questioning. Investigator McMahon testified defendant, who had described the victim at times as his "best friend," gave his last name as "Niesen" instead of "Liesen" and had conflicting stories of how he entered

Liesen's residence and where he parked his car. Initially, defendant said Liesen was outside the residence, in his garage, when he first arrived, and Liesen invited him in. When confronted with the presence of a witness, the neighbor Brady, defendant changed his story and said Liesen was inside the house when he first arrived, opened the door to the residence, and came out to welcome him. He also initially said he parked in the driveway until confronted with Brady's information. He then said he actually parked in the front yard, the evidence of which McMahon observed when he examined the scene. Likewise, defendant initially said he did not bring a gun or a knife with him to Liesen's residence, but when confronted with the fact a knife was found at the residence and asked about possible deoxyribonucleic acid (DNA) evidence, defendant said the knife "could have been his knife" and that "someone else may have stabbed it into the cabinet." He later said Liesen must have done it. When McMahon questioned how Liesen could have done this if, as defendant had previously indicated, both men exited the home at the same time, defendant changed his previous statement and said he walked out first and Liesen followed him two or three minutes later. McMahon then confirmed the interview was recorded. Once the prosecutor laid the foundation for playing the video to the jury, he requested an opportunity to be heard.

¶ 18                                    5. *Recorded Interview*

¶ 19        Outside of the presence of the jury, the prosecutor raised his concerns about how defendant's counsel, who had been in possession of a copy of the recorded interview "for months," had filed no motion seeking to prevent any portion of the video from being admitted into evidence. The prosecutor said he had been "anticipating some motion from the defense asking that certain things be redacted." However, since there had been no motions filed, the prosecutor wanted to bring the matter to the court's attention. The prosecutor said he was

assuming the defense was not objecting but he wanted to raise the issue because he "[did not] want to inject error into any trial before playing it." The defense attorney requested a brief recess, saying she previously talked to defendant about this issue but wanted to talk to him more before responding. Upon her return, she indicated the defense objected to the video because "there are multiple references to him being a felon" and since they were throughout the video, "it would be difficult to edit in a short timeframe." She contended, as an alternative, the deputy would be "able to testify to all the relevant portions of [the interview], so I would object." The State responded, stating since the defense had the video for several months, "they have had the opportunity to watch it and raise any objections. And, for whatever reason, they chose not to until right now." The prosecutor said the video "certainly could have been edited if I would have been informed that there were specific things that they did not want included." He went on to point out how defense counsel's failure to raise any issue about the contents of the video before trial should not now serve as a basis to prevent it from being played to the jury. The State suggested a limiting instruction would inform the jury they can only consider the conviction for impeachment and only if defendant testified.

¶ 20    The trial court, noting it had not seen the video at this point, inquired about the possibility of editing it before the next day of court. Estimating the number of references by defendant in the 48-minute video to being "a convicted felon" to be between three and six times, the prosecutor explained the difficulty with attempting to perform the necessary edits in that time frame. He explained the references were not by the investigating officers questioning defendant but by defendant himself, as his way of explaining why he would not have been in possession of a gun as the victim alleged. After defense counsel suggested recessing for the day in order to discuss a possible resolution with the State, the court inquired about how long defense counsel

had the video prior to trial. She agreed, "I've probably had it months, Your Honor." Counsel then said:

> "I realize that I have had [the video] a while, and I should have
>
> looked at it. I have a very high caseload and as a public defender,
>
> we get ready right beforehand, so I didn't have a lot of time to look
>
> at it and consider it before the last few days."

Counsel said she would need additional time to review the video, indicating she believed there may be more statements she might want excluded as well. The court inquired whether a limiting instruction, as suggested by the State, might suffice. After further discussion with defendant, counsel then informed the court there may be additional statements of concern unrelated to defendant's reference to being a convicted felon. The trial court reserved ruling on the video's admissibility and encouraged the State and defense counsel to see if they could come to an agreement by the next day.

¶ 21    The following day, outside the presence of the jury, both parties represented to the court they reached an agreement to exclude approximately 45 seconds of the recorded interview by muting the audio and blanking the video screen. The defendant confirmed he had the opportunity to discuss the recorded interview with his attorney and agreed to proceed in this fashion. Defense counsel stated there were still some references to defendant having a prior felony but this could be rectified by reading a limiting instruction to the jury regarding defendant's felony conviction at the conclusion of the trial when the other jury instructions were being given. Defendant informed the court he agreed with this strategy.

¶ 22    Investigator McMahon was recalled to the stand, and the recorded interview was introduced into evidence and published to the jury per the agreement. During the interview,

McMahon told defendant he did not believe defendant's version of events. He told defendant his story "makes no sense" because his story was so different from other witnesses. McMahon told defendant, "You've given us enough details of stuff that other people did see, that I know you're lying." On cross-examination, McMahon stated defendant called 911 and he was cooperative with the police. He reiterated there were no firearms found in defendant's home or on his property, and defense counsel made a point of having the investigator acknowledge defendant signed his statement of rights form with his left hand.

¶ 23                                    6. *Corey Formea*

¶ 24            Corey Formea testified he is a forensic scientist who has been with the Illinois State Police since 2001 and with their lab since 2008. He explained how he examines items of evidence for potential bodily fluids or stains and conducts DNA analysis on them to determine if there is a match between the DNA found and a known individual. He was qualified as an expert in the area of forensic biology and DNA analysis without objection. He testified he saw a brownish color on the knife blade found at the scene that tested positive for blood. He swabbed the knife blade for DNA and the handle of the knife to collect skin cells of the possible "handler" for DNA analysis. He then testified to the chain of custody of the swabs until the DNA analyst retrieved them for analysis.

¶ 25                                    7. *Jennifer Aper*

¶ 26            Jennifer Aper, a 22-year veteran forensic scientist with the Illinois State Police, explained how she collects and examines evidence for DNA testing and performs DNA analysis. She was also qualified as an expert in the area of DNA analysis without objection. She testified she examined the swabs from the blade and handle of the knife and compared them with DNA samples previously taken from defendant and Liesen. On the blade of the knife, she determined

the major DNA profile matched that of Liesen, while the DNA sample taken from the knife handle matched a major DNA profile of defendant. After Aper's testimony, the State rested its case.

¶ 27        Outside the presence of the jury and after defendant's motion for a directed verdict was denied, the trial court admonished defendant about his right to testify. Defendant informed the court he planned to testify but wanted more time to talk with his defense counsel. This came immediately after counsel had already indicated she did not believe she needed any additional time to speak to her client outside the presence of the court when the opportunity was offered. Based on defendant's response, the court agreed to take up the matter again before the afternoon session began. Proceeding to the instruction conference, defense counsel had no objection to the State's jury instruction 3.13, which read:

>        "Evidence of a defendant's previous conviction of an
>
>        offense may be considered by you only as it may affect his
>
>        believability as a witness and must not be considered by you as
>
>        evidence of his guilt of the offense with which he is charged."
>
>        Illinois Pattern Jury Instructions, Criminal, No. 3.13 (4th ed. 2000)
>
>        (hereinafter IPI Criminal 4th).

¶ 28                        8. *Theresa Martineau*

¶ 29        Before defendant's wife, Theresa Martineau, was called to testify, the trial court again admonished defendant about his right to elect whether to testify or not. The court asked whether defendant had now had enough time to speak with his attorney about it. Defendant responded in the affirmative and stated, "[Defense counsel] was very thorough." He said that after speaking with defense counsel, he had decided not to testify.

¶ 30 Defendant's wife testified neither she nor defendant owned any firearms on the day of the incident, that she was unaware of any firearms located within their home or on their property, and defendant is left-handed. After her testimony and outside the presence of the jury, defendant again confirmed it was his decision not to testify. The parties then had a brief discussion regarding the jury instructions, where the State withdrew its proposed jury instruction No. 1.02, which included the paragraph about a jury judging the testimony of a defendant in the same manner as they would judge the testimony of any other witness. See IPI Criminal 4th No. 1.02. All of the other instructions, including IPI Criminal 4th No. 3.13 set forth above, were read and provided to the jury without objection from defense counsel. The jury found defendant guilty of home invasion while armed with a dangerous weapon other than a firearm, but it found him not guilty of home invasion while armed with a firearm. The court set sentencing for October 2017. Defendant filed his "Motion for Judgment Notwithstanding the Verdict or, in the Alternative, Motion for New Trial" in September, alleging the verdict was against the manifest weight of the evidence and the State failed to prove him guilty beyond a reasonable doubt.

¶ 31 In October 2017, the trial court denied defendant's motion for a judgment notwithstanding the verdict and, without objection from the parties, continued the sentencing hearing to January 2018. At sentencing, the State requested that defendant serve 24 years in the Illinois Department of Corrections, and defense counsel requested the statutory minimum of 6 years. The court noted the mandatory penitentiary sentence required by the conviction for home invasion. It considered all relevant statutory factors in aggravation, including the defendant's criminal record, harm to the victim, and defendant's threat of serious harm. The court considered factors in mitigation, including defendant's dependents, his medical condition, and his cognitive disorder. The court found a sentence to the penitentiary was warranted based on the seriousness

of the offense, to protect the public, and to be consistent with the ends of justice and sentenced defendant to 20 years in the Illinois Department of Corrections.

¶ 32        This appeal followed.

¶ 33                        II. ANALYSIS

¶ 34        On appeal, defendant argues defense counsel was ineffective for failing to redact portions of a recorded interview between defendant and Investigator McMahon, including irrelevant and prejudicial other-crimes evidence and statements made by Investigator McMahon, which defendant characterizes as rendering opinions about defendant's guilt and truthfulness throughout the interview. Defendant also challenges his 20-year sentence as excessive, arguing the sentence amounted to a *de facto* life sentence and the court failed to give meaningful consideration to defendant's military service, cognitive disorder, and post-traumatic stress disorder (PTSD) as mitigating factors at sentencing. We affirm.

¶ 35                    A. Ineffective Assistance of Counsel

¶ 36        A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). To establish prejudice, the defendant must show there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing

*Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v. Peeples*, 205 Ill. 2d 480, 513, 793 N.E.2d 641, 662 (2002). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526.

¶ 37 A defendant must satisfy both prongs of *Strickland*, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010). "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141 (2009).

¶ 38 We first consider whether defense counsel's agreement upon the admission of defendant's other-crimes evidence might have been the product of sound trial strategy or deficient performance. Normally, " 'what matters to object to and when to object' are matters of trial strategy" (*People v. Perry*, 224 Ill. 2d 312, 344, 864 N.E.2d 196, 216 (2007)), and reviewing courts are to make every effort to evaluate counsel's performance from his perspective at the time, rather than in hindsight. See *People v. Madej*, 177 Ill. 2d 116, 157, 685 N.E.2d 908, 928 (1997).

¶ 39 Even though trial counsel's strategy is entitled to deference, counsel is still "expected to use established rules of evidence and procedure to avoid, when possible[,] the admission of incriminating statements, harmful opinions, and prejudicial facts." (Internal quotation marks omitted.) *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 32, 63 N.E.3d 211

(quoting *People v. King*, 316 Ill. App. 3d 901, 916, 738 N.E.2d 556, 568 (2000), quoting *People v. Moore*, 279 Ill. App. 3d 152, 159, 663 N.E.2d 490, 496 (1996)). We will defer to trial counsel's strategy unless it " 'appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy.' " *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 34, 145 N.E.3d 56 (citing *King*, 316 Ill. App. 3d at 916).

¶ 40    Here, defense counsel objected to admitting the recorded statement and publishing it to the jury. However, the objection was not lodged until the recording was about to be introduced during trial, and then, only when the prosecutor brought the matter to the trial court's attention and raised concerns about defense counsel's failure to file a motion *in limine* to redact certain portions of the interview prior to trial. Once the court excused the jury and took counsel into chambers, defense counsel asked to speak with her client on the issue. Counsel ultimately objected to the recorded interview due to "multiple references to [defendant] being a felon," saying "it would be difficult to edit [the interview] in a short timeframe." It bears noting counsel had apparently provided the trial court with a copy of an *in limine* motion the evening before trial and filed it the morning of trial, asking that defendant's prior convictions be precluded from use by the State for impeachment, yet the motion failed to include any reference to defendant's repeated mention of being "a convicted felon" during the video-recorded interview. During the pretrial hearing on the *in limine* motion, counsel made no reference to the video. Instead, once the matter was brought to the court's attention midtrial, counsel sought to preclude the use of the video in its entirety, claiming there was insufficient time to perform the necessary edits. Defense counsel provided no strategic reason for failing to file a pretrial motion *in limine* seeking redaction of what she was then contending to be prejudicial information. Midtrial, where her client was charged with a non-probationable Class X felony, defense counsel

told the court she had been in possession of the video for "months."

> "I realize that I have had [the video] a while, and I should have
> looked at it. I have a very high caseload and as a public defender,
> we get ready right beforehand, so I didn't have a lot of time to look
> at it and consider it before the last few days."

Since the matter had not been addressed before trial, the State pointed out it was not in a position to do the kind of overnight editing that could have been done prior to trial to remove each reference to defendant's convicted felon status, as well as the additional material eventually redacted. It was only then the State and defense counsel reached an agreement to exclude approximately 45 seconds of the 48-minute recorded interview, which included comments made by defendant about things he had done during his military service. Defense counsel acknowledged the rest of the video contained several other references to defendant being a convicted felon. In addition, the jury would be given IPI Criminal 4th No. 3.13:

> "Evidence of a defendant's previous conviction of an
> offense may be considered by you only as it may affect his
> believability as a witness and must not be considered by you as
> evidence of his guilt of the offense with which he is charged."

¶ 41       The parties' compromise permitted several references by the defendant to his "convicted felon" status to remain in the video, coupled with this limiting instruction to the jury, which defense counsel agreed could be given at the close of all the evidence. It is difficult to ascertain what counsel's trial strategy was at that point. She appears to admit she had not adequately prepared for trial and was not in a position to address the video other than to object to its admission. Although mentioned by the trial court several times, defendant had not yet

- 15 -

indicated whether he was going to testify, and in fact, when the time came, he initially said he was going to testify, then spoke with counsel briefly and ultimately declined to do so. Counsel's *in limine* motion had already been denied, so she knew the State was in a position to use one of his prior convictions for impeachment, and she was agreeing to the use of IPI Criminal 4th No. 3.13 as part of the compromise related to the video's use. However, once defendant elected not to testify, IPI Criminal 4th No. 3.13 was no longer applicable, yet counsel made no effort to have it removed as an instruction. The limiting nature of IPI Criminal 4th No. 3.13 provided defendant's conviction could be considered by the jury only as to defendant's credibility as a witness. However, because counsel failed to raise the issue pretrial, it was impossible for all practical purposes to obtain a redaction of all defendant's references to himself as a "convicted felon" in the video in the time available. She was left with a Hobson's choice of allowing the video with defendant's comments or objecting to the use of the video at all—an option neither acceptable to the State nor likely to be allowed by the court. The use of IPI Criminal 4th No. 3.13 was understandable so long as defendant was intending to testify. Once he expressed his intention to do otherwise, counsel was obligated to have IPI Criminal 4th No. 3.13 removed from the proposed instructions.

¶ 42       She then did nothing to remove it from the instructions to be given, and we can find no strategic or tactical reason for her failure to do so. Although we are to presume counsel's actions are the result of sound trial strategy, "if counsel's strategy choice 'appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy,' " that presumption is overcome. *Murphy*, 2019 IL App (4th) 170646, ¶ 34.

¶ 43       Having found counsel's performance deficient, *Strickland* requires that we must

next determine if counsel's deficient performance prejudiced defendant.

¶ 44 Recall, prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Evans*, 209 Ill. 2d at 219-20 (citing *Strickland*, 466 U.S. at 694). "In order to satisfy the prejudice prong, defendant need not show that he would have been acquitted, only that a different outcome would be reasonable, as prejudice may be found 'even when the chance that minimally competent counsel would have won acquittal is "significantly less than 50 percent" as long as a verdict of not guilty would be reasonable.' " *People v. Goods*, 2016 IL App (1st) 140511, ¶ 46, 62 N.E.3d 1168 (quoting *People v. McCarter*, 385 Ill. App. 3d 919, 935, 897 N.E.2d 265, 280-81 (2008), quoting *Miller v. Anderson*, 255 F.3d 455, 459 (7th Cir. 2001)).

¶ 45 In *Strickland*, the Supreme Court told us we should consider the totality of the evidence before the finder of fact when weighing the impact of counsel's errors. *Strickland*, 466 U.S. at 695. It noted:

> "Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96.

¶ 46 Here, the totality of admissible evidence included testimony from the victim

- 17 -

concerning defendant's unauthorized entry into his home , defendant's attack with a knife, as well as identifying photographs of the injuries to his neck and face. Additionally, during Liesen's testimony, his 911 call was admitted and published to the jury so they were able to assess the victim's apparent emotional state at the time of the call. They also saw a picture of the knife stuck into Liesen's kitchen cabinet and pictures of the damage done to his yard when defendant drove into it. Ken Brady saw Liesen before the altercation with no cuts or abrasions on his face before defendant entered the home. Brady saw defendant drive "relatively fast" into Liesen's yard and then walk quickly into the garage, heading toward the door into the house. Minutes later, Brady saw Liesen exit the house, followed immediately by defendant. Liesen was visibly upset, was crying, and had blood on his face and neck. Brady saw defendant place Liesen in a "bear hug," and he saw Liesen was upset. When Brady confronted defendant about Liesen's visible injuries, defendant began to approach him in what Brady must have considered a somewhat threatening manner, since he felt the need to put three fingers on defendant's chest and tell him to leave. He then observed defendant leave and saw the damage he did to Liesen's yard.

¶ 47        Members of the Adams County Sheriff's Office observed Liesen to be upset, and he appeared to have been crying and had blood around his face shortly after the incident. They observed the knife found sticking into a cabinet where Liesen said defendant put it, as well as the pair of sunglasses and beer can defendant left at the residence. The jury was also told about defendant's interview and how his story changed as defendant was confronted with other evidence the deputies possessed. The jury was able to compare defendant's version of the incident with the observations of Brady and the physical evidence observed by the deputy sheriffs. Defendant eventually admitted possessing a knife when he was at Liesen's home, but he denied there was an altercation or his entry into the residence was uninvited. Forensic scientists,

however, were able to identify Liesen's DNA in the blood found on the knife blade and defendant's DNA on the handle, all of which was consistent with the attack as the victim described.

¶ 48    We must now consider how counsel's failures—failure to seek a redaction of the interview and failure to withdraw or object to IPI Criminal 4th No. 3.13 once defendant opted against testifying—affected the jury's overall picture of events. See *McCarter*, 385 Ill. App. 3d at 936 (citing *Strickland*, 466 U.S. at 695-96). The jury was able to view defendant's recorded statement and hear him in his own words referencing his felony conviction in explaining to the investigator why he did not possess or own any firearms. They also heard defendant's wife testify, denying defendant owned or possessed a gun at that time. In spite of the victim's assertions, the jury found defendant not guilty of the firearm-related count. As defendant did not testify, his recorded statement was his only version of events presented to the jury. By failing to seek withdrawal of IPI Criminal 4th No. 3.13, the jury was improperly instructed to consider defendant's reference to being a convicted felon as impeachment of his statements made during the interview. Although improper, it clearly did not prevent them from deciding defendant was not guilty of the firearm related offense, in spite of the instruction.

¶ 49    However, the fact that defendant provided multiple versions of what occurred as the interview progressed was clearly considered by the jury, and properly so. During defendant's recorded interview, he provided conflicting statements about the event, including: (1) where Liesen was when he arrived, (2) where he parked his car when he arrived, (3) if he brought a knife with him and how it wound up sticking in the kitchen cabinet door, (4) the last time he saw Liesen, (5) if his DNA would be found on the knife located within Liesen's residence, and (6) how and when both he and Liesen exited the residence. The jury obviously considered

defendant's conflicting statements against him and found the victim more credible in that regard.

¶ 50        Defendant also complains about some of the comments Investigator McMahon made during the interview. What defendant characterizes as comments on defendant's credibility were, in fact, normal police interrogation techniques. As the State notes in its brief, the cases cited by defendant in support of this claim each involve comments made by officers *at trial*, relating to their opinions about a defendant's guilt or innocence. In *People v. Moore*, 2012 IL App (1st) 100857, 964 N.E.2d 1276, cited by defendant, the comments found improper were not those claimed to be the opinions of the investigators but references to other crimes and gang membership. In *Moore*, the State played a video where the investigators apparently commented on their belief the defendant was lying or was guilty of the offense for which he was being questioned. *Moore*, 2012 IL App (1st) 100857, ¶ 43. *Moore*'s claim was the same as defendant's here—that counsel was ineffective for allowing evidence of the investigators' opinions of his truthfulness or guilt to be presented to the jury. Citing *People v. Hanson*, 238 Ill. 2d 74, 939 N.E.2d 238 (2010), the First District stated:

> "Where the testimony is not a current comment on the
> defendant's credibility [citation], the police accusations may be
> seen as a standard interrogation tactic, rather than an improper
> opinion on [defendant's] credibility." *Moore*, 2012 IL App (1st)
> 100857, ¶ 52.

¶ 51        The statements here are the same thing—merely part of the course of the investigation and how Investigator McMahon confronted defendant during the interview. We addressed the identical situation in *People v. Whitfield*, 2018 IL App (4th) 150948, 103 N.E.3d 1096, where the defendant contended he was denied a fair trial when portions of his interrogation

video were played to the jury. Defendant objected to what he characterized as "improper opinions and commentary from the officers on his credibility and eventual defenses." *Whitfield*, 2018 IL App (4th) 150948, ¶ 43. Finding the investigators' comments were not inadmissible hearsay, we said such statements were not offered for their truth but for their effect on the listener, a perfectly legitimate basis for admissibility. *Whitfield*, 2018 IL App (4th) 150948, ¶ 47 (citing *People v. Britz*, 112 Ill. 2d 314, 320, 493 N.E.2d 575, 578 (1986); *People v. Sorrels*, 389 Ill. App. 3d 547, 553, 906 N.E.2d 788, 793 (2009)). We also identified a two-step analysis trial courts should consider:

> "In determining whether or which questions or statements by a police officer during an interrogation of the defendant are admissible *** (1) whether the officer's questions or statements would be helpful to the jury so as to place defendant's responses (or lack thereof) into context and (2) assuming the first criteria is satisfied, whether the prejudicial effect of the officer's questions or statements substantially outweighs their probative value."
>
> *Whitfield*, 2018 IL App (4th) 150948, ¶ 48.

¶ 52 Concluding similar cases from sister districts imposed an unnecessarily high degree of "probativeness" based on whether admissibility was shown to be "necessary," we held that "questions and statements by police officers during a defendant's interrogation may still possess probativeness where they are simply 'helpful,' although perhaps not essential or 'necessary,' to a jury's understanding of the defendant's responses or silence." *Whitfield*, 2018 IL App (4th) 150948, ¶ 48. Here, defendant complains about three comments made by the investigator to him during his interview:

(1) "Convince me why I should believe your story and not [the victim's]. Because yours isn't even close."

(2) "[W]hen we get this knife back from the lab, it's going to have a couple different things on it. It's going to have [the victim's] blood on it. Because I believe 100 percent that that knife cut his neck. And also, I have a strong suspicion that it's going to have your fingerprints or DNA on it."

(3) "I'm not going to sit here and b***. If this is the story you want to go with, that's fine. I'm telling you that I don't believe you I'm sorry. It doesn't mean I don't like you or think you're a bad person but I don't believe your story. It makes no sense. And it's so far off from his story and people who saw some of these things happen—You've given us some details of stuff that other people did see, that I know you're lying."

¶ 53    These are all fairly classic and common police interrogation comments and questions, specifically intended to elicit a response from the suspect. They meet both criteria we identified in *Whitfield* and were admissible for that purpose. In addition, there was nothing about the comments which was not otherwise proven through competent evidence, so there was no prejudice to defendant in their admission.

¶ 54    Considering the totality of the evidence presented at trial, defense counsel's failure to secure the redaction of comments by defendant about being a convicted felon, although error, did not appear to prejudice defendant since, for one thing, the jury found him not guilty of the weapons-related offense. In addition, within the context of the interview, it is not

unreasonable to believe at least one of defendant's references to being a convicted felon would have been admissible since it was in response to police questioning and was his explanation for why he did not possess a firearm, a point further corroborated by his wife and apparently accepted by the jury.

¶ 55 Finally, defendant complains about the failure to redact his offhand comment about casual marijuana usage on vacation. Taken in context, it is so insignificant it merits no mention here. Having considered each of the areas of which defendant complains within the context of the interview, we cannot find the errors of counsel had such a significant impact on the jury's overall picture of events to undermine confidence in the outcome. See *McCarter*, 385 Ill. App. 3d at 936.

¶ 56 Based on the totality of the admissible evidence presented, we must conclude no reasonable probability exists the jury's verdict would have been different but for counsel's errors. See *Evans*, 209 Ill. 2d at 219-20 (citing *Strickland*, 466 U.S. at 694).

¶ 57 B. Excessive Sentence

¶ 58 Defendant also argues the trial court erred in imposing a sentence of 20 years in prison because the sentence was excessive, amounted to a *de facto* life sentence, and the court failed to properly consider mitigating factors. We disagree.

¶ 59 We first note, as defendant acknowledges, he did not file a motion to reconsider his sentence before the trial court, which would normally result in forfeiture on appeal. See *People v. Ely*, 2018 IL App (4th) 150906, ¶ 13, 99 N.E.3d 566. However, where the defendant demonstrates plain errors or defects affecting a substantial right, the appellate court may consider the claim. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). The first step in a plain-error analysis is to

determine whether there was a clear and obvious error at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49, 89 N.E.3d 675.

¶ 60　　　　A trial court has broad discretion in imposing a sentence. *People v. Patterson*, 217 Ill. 2d 407, 448, 841 N.E.2d 889, 912 (2005). When a sentence falls within the statutory range of sentences possible for a particular offense, it is presumed reasonable. *People v. Moore*, 41 Ill. App. 3d 3, 4, 353 N.E.2d 191, 192 (1976). " 'In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment, must be equally weighed.' " *People v. Hestand*, 362 Ill. App. 3d 272, 281, 838 N.E.2d 318, 326 (2005) (quoting *People v. Hernandez*, 319 Ill. App. 3d 520, 529, 745 N.E.2d 673, 681 (2001)).

¶ 61　　　　"Because the trial court is in a better position to observe the witnesses and consider the relevant factors, its sentencing determination is entitled to great deference." *People v. Kenton*, 377 Ill. App. 3d 239, 245, 879 N.E.2d 402, 407 (2007). " 'Absent an abuse of discretion by the trial court, a sentence may not be altered upon review.' " *People v. Hensley*, 354 Ill. App. 3d 224, 234, 819 N.E.2d 1274, 1284 (2004) (quoting *People v. Kennedy*, 336 Ill. App. 3d 425, 433, 782 N.E.2d 864, 871 (2002)). An abuse of discretion will be found "where the sentence is 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010) (quoting *People v. Stacey*, 193 Ill. 2d 203, 210, 737 N.E.2d 626, 629 (2000)). Also, an abuse of discretion will not be found unless the court's sentencing decision is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 26, 82 N.E.3d 693.

¶ 62　　　　In this case, defendant was convicted of home invasion while armed with a

dangerous weapon other than a firearm, a Class X felony (720 ILCS 5/19-6(a)(1) (West 2016)). A defendant convicted of a Class X felony is subject to a sentencing range of 6 to 30 years in the Illinois Department of Corrections. 730 ILCS 5/5-4.5-25 (West 2016). As the trial court's 20-year sentence fell within the relevant sentencing range, it is presumed to be proper, and we will not disturb the sentence absence an abuse of discretion. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46, 19 N.E.3d 1070.

¶ 63        Defendant has failed to show how the imposition of a sentence in the mid-range of permissible sentences was error. The trial court began its comments on the imposition of sentence by indicating it was considering: "the evidence at trial, Presentence Investigation Report, including the numerous letters of support that are attached thereto, history, character and attitude of the Defendant, the arguments, statements of the Defendant here today." The court further noted it had "considered all the statutory matters in aggravation and mitigation and regard for the circumstances of the offense" before imposing a 20-year sentence. The court made specific reference to statutory factors in aggravation, including defendant's criminal record, the fact that some harm occurred, and serious harm was threatened by defendant's conduct. In mitigation, the court specifically referenced defendant's wife as a dependent who had provided a letter outlining the financial and emotional hardship a prison sentence will cause her. The court further noted defendant's medical condition, his PTSD diagnosis from 1995, and his "clarified cognitive disorder" diagnosed in 2008. The court mentioned, and therefore took into consideration, defendant's disability from an automobile accident, his reported brain damage and the extensive therapy he underwent at the Veterans Affairs hospital in Iowa, and pointed out how that was being considered by the court when fashioning a sentence.

¶ 64    Defendant argues the trial court did not properly weigh various mitigating factors, such as his rehabilitative potential, and failed to mention others. "A defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense." *People v. Pippen*, 324 Ill. App. 3d 649, 652, 756 N.E.2d 474, 477 (2001). "The seriousness of the offense is the most important sentencing factor." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 50, 1 N.E.3d 1145. "When imposing a sentence, the trial court must consider statutory factors in mitigation and aggravation, but the court need not recite and assign a value to each factor it has considered." *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38, 92 N.E.3d 494. "The weight to be accorded each factor in aggravation and mitigation in setting a sentence of imprisonment depends on the circumstances of each case." *People v. Hernandez*, 204 Ill. App. 3d 732, 740, 562 N.E.2d 219, 225 (1990). "The defendant bears the burden to affirmatively establish that the sentence was based on improper considerations, and we will not reverse a sentence *** unless it is clearly evident the sentence was improper." *Etherton*, 2017 IL App (5th) 140427, ¶ 29. Defendant lists various mitigating factors, some of which were referenced by the court, in spite of defendant's claim they were not, such as his PTSD and his cognitive brain disorder, and others which were referenced more generally or not at all. Regardless, the essence of defendant's argument is not really that the court failed to consider defendant's particular circumstances but that the court did not assign as much weight to it as he would have liked. When mitigating evidence is before the court, it is assumed that the court considered it, unless the record indicates otherwise. *People v. Burton*, 184 Ill. 2d 1, 34, 703 N.E.2d 49, 65 (1998).

¶ 65    Here, the trial court expressly noted the statutory factors in aggravation and mitigation it considered most important, as well as the additional letters, defendant's medical information, and his military history, and the court described how they impacted its decision on

the specific sentence imposed. The fact defendant believes they should have had a greater impact on his sentence, unfortunately, does not make it so. "The balance to be struck amongst the aggravating and mitigating factors is a matter of judicial discretion that should not be disturbed absent an abuse of discretion." *People v. Crenshaw*, 2011 IL App (4th) 090908, ¶ 24, 959 N.E.2d 703. "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999).

¶ 66 The presentence investigation report revealed defendant already had five felony convictions, eight misdemeanor convictions, and a number of traffic and ordinance violations spanning over five counties and two states beginning from the early 1990s. Based on this record, we cannot conclude the trial court's 20-year, mid-range sentence for a Class X home invasion while armed with a knife was " 'greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20, 143 N.E.3d 794 (quoting *Fern*, 189 Ill. 2d at 54). Absent a finding of error, there is no need to proceed further with a plain-error analysis. See *People v. Staake*, 2017 IL 121755, ¶ 33, 102 N.E.3d 217.

¶ 67                                  III. CONCLUSION

¶ 68 For the reasons stated, we affirm defendant's conviction and sentence.

¶ 69 Affirmed.