# Illinois Official Reports

## Appellate Court

---

### *People v. Whitfield*, 2018 IL App (4th) 150948

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WESLEY LAWRENCE WHITFIELD, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-15-0948 |
| Filed | June 8, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Macon County, No. 14-CF-1090; the Hon. James R. Coryell, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael Gomez, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Jay Scott, State's Attorney, of Decatur (Patrick Delfino, David J. Robinson, and Erin Wilson Laegeler, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.<br>Justices Steigmann and DeArmond concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant, Wesley Lawrence Whitfield, was convicted of aggravated battery of a child (720 ILCS 5/12-3.05(b)(2) (West 2012)) and sentenced to four years in prison. He appeals, arguing (1) portions of his videotaped interrogation were improperly admitted at his trial and played for the jury and (2) the State improperly impeached a defense witness. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3    In September 2014, the State charged defendant with two counts of aggravated battery of a child (*id.*). It alleged defendant caused bodily harm to his two children, N.W. and S.W., by repeatedly striking N.W. (count I) and repeatedly striking and burning S.W. (count II). In January 2015, defendant waived his right to counsel and began representing himself.

¶ 4    The record reflects defendant filed several pretrial motions, including two motions addressing his bond. In January 2015, he filed a motion for bond reduction or a recognizance bond. At a hearing that same month, defendant's father, Luther Whitfield, testified on defendant's behalf. Luther agreed he received a call in September 2014 regarding defendant's "case." He learned defendant had been charged and the amount of his bond. The State declined any cross-examination, and following defendant's testimony on his own behalf, the trial court granted the motion and lowered defendant's bond.

¶ 5    In June 2015, defendant filed a motion for a recognizance bond. In July 2015, the trial court conducted a hearing on that motion and other pretrial motions filed by defendant, including a motion to suppress evidence. Relative to the motion for a recognizance bond, Luther, again, testified on defendant's behalf. He stated defendant's children had been in a car accident approximately a week before the date of the alleged offenses and defendant's arrest. According to Luther, the accident resulted in N.W. receiving medical care. Luther suggested the charges against defendant were based on injuries the children likely sustained in the automobile accident. Further, he testified he attempted to obtain medical records related to the accident for defendant but was unable to do so. Ultimately, the court denied defendant's motion.

¶ 6    In August 2015, defendant's jury trial was conducted. The record reflects the matter proceeded to trial on only count I, charging defendant with the aggravated battery of N.W. Count II, setting forth the charges related to S.W., was dismissed on the State's motion.

¶ 7    At trial, Laura Cole testified she was the maternal grandmother of N.W. and S.W. Her daughter Nicole was the children's mother and had been in a relationship with defendant. On October 4, 2011, the day N.W. was born, Nicole passed away. Thereafter, defendant was the primary caregiver for both children. At the time of the alleged offense, N.W. was two years old.

¶ 8    In September 2014, Laura resided in Wisconsin but traveled to Decatur, Illinois, with her daughter Markeena Cole to meet with defendant and visit S.W. and N.W. Laura testified she and Markeena arrived at defendant's home at around 5 p.m. or 6 p.m. on September 3, 2014. She visited with her grandchildren and asked defendant if the children could stay the night with her at her hotel. Initially, defendant refused; however, at the encouragement of a friend, he allowed Laura and Markeena to take the children. Laura recalled that, although the weather

was sunny and the temperature was 85 or 90 degrees, N.W. was dressed in a long-sleeved shirt and jeans.

¶ 9 After leaving defendant's house, Laura, Markeena, and the children visited Thelma Lawson's home, which Laura described as "the kids' cousin['s] house." While at Lawson's home, Laura heard S.W. say " '[d]addy whip [N.W.] like this' " and saw S.W. demonstrate "how [N.W.] got a whipping." Laura then raised N.W.'s shirt and saw "the welts and everything on him." She showed what she discovered to Markeena and Lawson.

¶ 10 Ultimately, Laura took N.W. to the hospital. She testified the police and the Illinois Department of Children and Family Services (DCFS) were called, and S.W. and N.W. were taken into protective custody. In October 2014, Laura relocated to Decatur "for [her] grandkids." At the time of trial, both children were in her care.

¶ 11 During her testimony Laura viewed photographs, which she testified depicted the appearance of N.W.'s injuries on September 3, 2014. She denied that any of the injuries shown in the photographs occurred between the time she picked N.W. up from defendant's house and when she took N.W. to the hospital.

¶ 12 On cross-examination, Laura acknowledged that she had tried to gain custody of S.W. and N.W. in the past. Further, she agreed that, prior to her arrival in Decatur, defendant told her during a telephone conversation that the children had recently been in a car accident. Also, Laura acknowledged that, after discovering N.W.'s injuries at approximately 8:30 p.m., she went to her hotel before taking N.W. to the hospital.

¶ 13 Markeena testified similarly to Laura, stating she and her mother traveled from Wisconsin to Decatur on September 3, 2014, to visit S.W. and N.W.; defendant reluctantly allowed them to have the children overnight; and they initially took the children to Lawson's home. While at Lawson's home, Laura showed Markeena injuries on N.W. Markeena testified N.W. had been wearing a long-sleeved shirt and long pants although it was "[b]urning hot" outside and close to 90 degrees.

¶ 14 After noticing N.W.'s injuries, Markeena, Laura, and the children went to a hotel and "kind of sat down and decided what would be the best thing to do about the situation." Markeena concluded that the children should not be returned to defendant and that they needed to "get some help." She stated they then took the children to the hospital. Markeena denied that N.W. was injured while in her and Laura's care. On cross-examination, she acknowledged that Laura had tried to gain custody of the children in the past.

¶ 15 Dr. Edward Leon testified he was an emergency room physician in Decatur and treated N.W. at the hospital in the early morning hours of September 4, 2014. According to Dr. Leon, he observed injuries on primarily the left side of N.W.'s body—specifically, on N.W.'s arm, back, buttocks, and left leg. He stated the injuries consisted of bruising and what appeared to be "belt marks." Dr. Leon estimated that the injuries were inflicted "within a few days" and opined they were "consistent with being whipped with a cord or a belt."

¶ 16 On cross-examination, Dr. Leon testified he first examined N.W. around 12:30 a.m. He recalled that the children's grandmother was present and was concerned about child abuse. Dr. Leon testified he was not aware that the children had been in a car accident approximately a week prior to their hospital visit. On re-direct, Dr. Leon testified the injuries depicted in a photograph of N.W.'s left arm did not appear to be consistent with a car accident. On

re-cross-examination, he opined the injuries depicted in the same photograph appeared to have been inflicted "within days" rather than within the course of several hours.

¶ 17   City of Decatur police officer Jason Danner testified he went to Decatur Memorial Hospital on September 4, 2014, in response to a report of child abuse. Upon his arrival, he spoke with Laura and made contact with N.W. Danner stated he observed injuries to N.W., which he described as follows: "[N.W.] had welts up and—or looped-shaped welts all up and down his arms, his legs. He had bruising and scars on his back and abrasion—an old abrasion on the side of his hip." Danner identified photographs he took of N.W.'s injuries at the hospital. He testified the photographs fairly and accurately depicted how N.W.'s injuries appeared on September 4, 2014. Ultimately, the photographs, contained in People's exhibit Nos. 2 through 19, were admitted into evidence.

¶ 18   Danner further testified that on September 5, 2014, defendant was taken into custody. At police headquarters, he made contact with defendant and read him the *Miranda* warnings (*Miranda v. Arizona*, 384 U.S. 436 (1966)). Defendant indicated he understood his rights, and he agreed to speak with Danner. According to Danner, defendant asserted that he did not "beat his kids; he only spank[ed] them."

¶ 19   On cross-examination, Danner explained differences in some of the photographs that depicted the same area of N.W.'s body as the result of different camera angles and different lighting. Further, he testified he was not aware that the children had been in a car accident in the week before the events at issue and defendant did not inform him of a car accident at the time of their interview.

¶ 20   Police officer Josh Whitney testified he responded to Decatur Memorial Hospital on September 4, 2014, and was advised by Danner that defendant was suspected of causing injury to N.W. Whitney contacted defendant by telephone and told him to come to the hospital. He testified he explained to defendant that the police needed to talk to him about his children. According to Whitney, defendant stated he would be there but never showed up. Police officer Tyler Nottingham testified he arrested defendant on September 5, 2014.

¶ 21   Police officer Kyle Daniels testified he interviewed defendant on September 5, 2014. Initially, he reminded defendant of the *Miranda* warnings, and defendant agreed to speak to him without having an attorney present. Daniels testified he recorded his interview and informed defendant that he was being recorded. The hour-long audio and video recording was then played for the jury. Daniels agreed that the recording was complete and accurate "except for certain edits that were made to remove dead time and to remove discussion of another incident." Further, he testified that approximately halfway through the interview, he and defendant were joined by Eric Ethel, a juvenile detective who was training Daniels.

¶ 22   In the recorded interview, defendant acknowledged that he disciplined and spanked his children. Specifically, he admitted spanking N.W. with a thin, leather belt that was folded over. Defendant reported that N.W. would move or be "squirming" around during a spanking, which caused defendant to strike areas other than N.W.'s buttocks, including N.W.'s arm, hand, and the inside of his leg. Defendant admitted that his spanking of N.W. with the belt caused "welts" on N.W. and the "circular marks" that appeared on N.W.'s body, particularly N.W.'s left arm. Defendant agreed that "most" of the injuries to N.W. depicted in photographs shown to him by the officers were from being spanked. Further, he acknowledged that the marks on N.W. "looked bad" and not "right." He stated he did not mean to "break [N.W.'s] skin" when spanking him. Defendant also admitted that he went "overboard," that he "made a mistake,"

and that he could use "counseling" on how to discipline his children. Finally, defendant acknowledged that the injuries depicted in the photographs of N.W. occurred at "different times."

¶ 23    The record reflects defendant did not object to the recording being played for the jury. However, the last several minutes of the recording showed him alone in the interview room praying. Defendant did raise an objection to that portion of the video being played, which the trial court overruled.

¶ 24    When cross-examining Daniels, defendant asked to play portions of the video recording again; however, the State objected and the trial court sustained its objection. On cross-examination, Daniels further agreed that defendant reported to him that the children had been in a car accident prior to the events at issue. He stated he investigated the accident and learned from a traffic accident report that S.W. "was listed with no injury and [N.W.] was non incapacitating injury." Daniels stated he did not investigate further into the traffic accident because none of N.W.'s injuries "were consistent with a traffic accident."

¶ 25    At the conclusion of Daniels's testimony, the State moved to admit its exhibits, including the recording, into evidence. Defendant objected to the recording on the basis that the State "was trying to speculate that [he] made a confession to intentionally harm [his] son," which defendant asserted was not true. He also objected to the recording on the bases that the end of the recording showed him praying while alone in the interview room and because Daniels did not inform him that he was being recorded. The trial court allowed the recording into evidence over defendant's objections.

¶ 26    Next, defendant presented evidence on his own behalf. He first called his sister, Latasha Whitfield, as a witness. Latasha testified defendant had cared for his children since birth. She denied witnessing defendant "beat" or be "abusive" to his children.

¶ 27    Latasha further testified that on August 21, 2014, she was in a car accident with S.W. and N.W. She stated the driver's side of her vehicle was "T-boned" by a sport utility vehicle "truck." "[I]t knocked [her] so hard [that she] ben[t] the gear shift" and was rendered unconscious. According to Latasha, the children were "shooken up" and "knocked" around by the force of the accident. She testified everyone was hurt, but she did not experience pain until approximately one week after the accident. N.W. was behind the driver's seat and thrown out of his car seat. He was placed in a neck brace and taken to the hospital by ambulance.

¶ 28    On cross-examination, Latasha acknowledged having a felony conviction for aggravated robbery. Additionally, she testified she observed "some blood on [N.W.'s] mouth" following the car accident. Otherwise, she did not check his body for injury. Latasha testified that immediately following the accident she was being "checked" and had to stay at the accident scene while N.W. was taken away in an ambulance. When shown the photographs of N.W. contained in People's exhibit Nos. 2 through 19, Latasha could not identify any of the injuries depicted in the photographs as being sustained in the car accident.

¶ 29    Defendant's father, Luther, was next called to testify. Luther stated he was aware of the August 21, 2014, car accident. He described it as a "major accident" and stated N.W. was thrown from the left to the right side of the car. Luther rode with N.W. in the ambulance to the hospital. He stated N.W. was placed in a neck brace and had "marks and scratches all on the left side of his arm" and "a red mark on his back." Luther testified that injuries to N.W. depicted in People's exhibit Nos. 2 through 19 were from the car accident. However, when shown People's exhibit No. 15, depicting injuries on N.W.'s back, Luther testified he did not

observe N.W. "in that bad of a shape." More specifically, he testified he saw N.W. on the day that Laura took him for an overnight visit and did not observe the back injuries depicted in People's exhibit No. 15 at that time. Luther testified he was familiar with Laura and was aware that she previously tried to obtain custody of S.W. and N.W. on three separate occasions. Luther further testified that neither the police nor DCFS questioned him about the August 21, 2014, car accident.

¶ 30 On cross-examination, Luther acknowledged having a felony conviction for unlawful restraint, for which he served two years' probation. He testified he did not go to the police department with information that N.W.'s injuries were caused by the car accident because he "figured that the court would [find] out that [defendant] wasn't a child abuser" and the charges would be dropped. The following colloquy then occurred between Luther and the State:

"Q. Have you ever approached anyone in an attempt to give them this information that you've testified here today—to today for the first time?

A. Yes. They had bond court I had—I had told you and the judge here about it, yes.

Q. You told me?

A. You and the judge, about the car accident. Matter of fact, that was about a couple of weeks ago. I was in court, he called me up here to testify because I was trying to get him bond. You remember you trying to get bond on the motion that he tried to suppress some evidence.

Q. You're saying a couple of weeks you testified in court that—

A. That they was in a car accident. Y'all didn't ask me nothing about that. You—I told you I testified that they was in a car accident."

Luther specified that his testimony was during a hearing on defendant's "last motion" and involved "a motion to suppress some evidence."

¶ 31 Following Luther's testimony and outside the presence of the jury, the State asserted its intention to present, on rebuttal, a certified copy of the transcript of a bond hearing during which Luther testified for defendant. The State asserted that contrary to Luther's testimony at trial, he made no mention of the car accident or "it causing injuries to the child." Defendant objected on the basis that the State had a transcript of the wrong hearing and that Luther had been referring to a more recent bond hearing that also involved a motion to suppress by defendant. The trial court stated "that's something we'll deal with when it comes up."

¶ 32 Dwayne Jones next testified on defendant's behalf. He stated he was engaged to Shayla Cooper, defendant's sister. Jones also was aware of the car accident that occurred on August 21, 2014, and observed the accident scene. He stated the side of Latasha's car was totaled, glass was in the car, and the car seat was "tossed around." Jones next went to the hospital and saw N.W. who was wearing a hospital gown. He observed "a little cut or bruise on [N.W.'s left] arm," as well as "a couple of bruises [that] looked like scratches from maybe glass or something on [N.W.'s] back." Jones also testified that he was familiar with Laura and was aware that she had tried to "take [defendant's] kids from [him] in the past."

¶ 33 On cross-examination, Jones stated that following the accident N.W. had "a scratch or a slight cut from the glass" on his left arm, which he stated was approximately two inches long. Jones also observed "a couple of bruises" and a "little scratch" on N.W.'s upper back. Jones stated he did not observe blood coming out of N.W.'s mouth.

¶ 34    Shayla Cooper, defendant's sister, testified she was aware that Laura had made multiple attempts to obtain custody of defendant's children. Cooper also stated that she went to the hospital following the August 21, 2014, car accident. She recalled seeing N.W. wearing a neck brace. On cross-examination, Cooper testified that N.W.'s back did not look the same after the car accident as it did in the photograph in People's exhibit No. 15. Further, she denied noticing "any other injuries to [N.W.'s] body on the day of the car accident."

¶ 35    Thomas Copeland testified he was a pastor and had known defendant approximately six years. He gave defendant a ride to the hospital following the August 21, 2014, car accident. Copeland also observed the car that Latasha and the children had been riding in and described it as "totaled on the driver's side."

¶ 36    Barbara Whitfield testified she was defendant's mother. She was familiar with Laura and recalled that she tried to gain custody of defendant's children on several occasions. Barbara saw the aftermath of the car accident and described significant damage to the driver's side of Latasha's vehicle.

¶ 37    At the conclusion of defendant's evidence, the State presented police officer Craig Lundy as a rebuttal witness. Lundy testified he was a crash reconstructionist with the Decatur Police Department's fatal accident investigation team. He investigated the August 21, 2014, accident involving defendant's sister and children. Lundy described the accident as a single-contact crash. N.W. was riding in the vehicle that was struck and was positioned near the point of impact—the driver's side back door. However, Lundy noted there were "no visible injuries" and that "[n]o one was bleeding." He stated N.W. was taken to the hospital "to check on his condition as he was at the locus point of the contact."

¶ 38    The State also sought to admit the transcript of a January 2015 bond hearing during which Luther testified. Again, defendant objected on the basis that the State was presenting a transcript of a different hearing, stating his most recent bond hearing and the one during which Luther testified about the car accident, occurred in March 2015. The trial court allowed the transcript into evidence over defendant's objection, stating to defendant that "[i]f you want to get a transcript [of the more recent bond hearing], you can put on surrebuttal."

¶ 39    At the conclusion of the trial, the jury found defendant guilty of the charged offense. In September 2015, defendant filed several posttrial motions raising various claims of error not at issue on appeal and arguing he was denied a fair trial. In October 2015, the trial court conducted a hearing and denied defendant's motions. In November 2015, the court sentenced defendant to four years in prison.

¶ 40    This appeal followed.

¶ 41                                    II. ANALYSIS
¶ 42                              A. Interrogation Video
¶ 43    On appeal, defendant first argues he was denied a fair trial because certain portions of his interrogation video were played for the jury and admitted into evidence at trial. He maintains the video contained inadmissible hearsay assertions from the investigating officers, improper opinions and commentary from the officers on his credibility and eventual defenses, and improper opinions from the officers on the strength of the State's evidence. Defendant contends the challenged statements from the officers were irrelevant and unduly prejudicial.

¶ 44    Initially, defendant acknowledges that he has forfeited this issue by failing to raise it with the trial court. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988) (holding that to preserve an issue for appellate review, a defendant must both make a trial objection and raise the issue in a written posttrial motion). However, he argues that inclusion of the officers' statements in the interrogation video amounted to plain error and this court should excuse his forfeiture.

¶ 45    Under the plain-error doctrine, a defendant's procedural default may be excused

> "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675.

"The initial analytical step under either prong of the plain error doctrine is determining whether there was a clear or obvious error at trial." *Id.* ¶ 49.

¶ 46    Whether evidence is relevant and admissible at trial is within the trial court's discretion. *People v. Hanson*, 238 Ill. 2d 74, 101, 939 N.E.2d 238, 254 (2010). On review, "[a] decision to admit evidence *** will not be overturned unless it is arbitrary, fanciful or unreasonable." *Id.*

¶ 47    Hearsay is not involved where a challenged statement "is admissible not for its truth, but for its effect on the listener." *People v. Britz*, 112 Ill. 2d 314, 320, 493 N.E.2d 575, 578 (1986). In other words, "[a]n out-of-court statement offered to prove its effect on a listener's mind or to show why the listener subsequently acted as he did is not hearsay and is admissible." (Internal quotation marks omitted.) *People v. Sorrels*, 389 Ill. App. 3d 547, 553, 906 N.E.2d 788, 793 (2009). However, even relevant evidence may be excluded where its probative value is substantially outweighed by its prejudicial effect. *People v. Walker*, 211 Ill. 2d 317, 337-38, 812 N.E. 2d 339, 351 (2004).

¶ 48    In determining whether or which questions or statements by a police officer during an interrogation of the defendant are admissible, a trial court should consider (1) whether the officer's questions or statements would be helpful to the jury so as to place the defendant's responses (or lack thereof) into context and (2) assuming the first criteria is satisfied, whether the prejudicial effect of the officer's questions or statements substantially outweighs their probative value. We note that this analysis is mostly consistent with the analysis suggested by our sister districts in *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33, 963 N.E.2d 378, and *People v. Hardimon*, 2017 IL App (3d) 120772, ¶ 35, 77 N.E.3d 1184. In those cases, the Second and Third Districts indicated that statements of an investigating officer during a police interview or interrogation of the defendant are admissible when they are "necessary" to show the effect of the statement on the defendant or to explain the defendant's subsequent actions. *Theis*, 2011 IL App (2d) 091080, ¶ 33 ("[A]n out-of-court statement that is *necessary* to show its effect on the listener's mind or explain the listener's subsequent actions is not hearsay." (Emphasis added.)); *Hardimon*, 2017 IL App (3d) 120772, ¶ 35 ("Generally, statements made by an investigating officer during an interview with the suspected defendant are admissible if they are *necessary* to demonstrate the effect of the statement on the defendant or to explain the defendant's response." (Emphasis added.)). However, to the extent that *Theis* and *Hardimon* impose a higher degree of probativeness regarding an officer's statements or questions through their use of the word "necessary," we respectfully disagree. We find that questions and

statements by police officers during a defendant's interrogation may still possess probativeness where they are simply "helpful," although perhaps not essential or "necessary," to a jury's understanding of the defendant's responses or silence.

¶ 49   In this instance, the challenged statements were not hearsay, as they were not offered for the truth of the matters asserted. Rather, they were helpful to the jury in that they provided context for what occurred during the police interrogation and were useful in explaining defendant's statements and admissions. Defendant concedes that statements he made during his videotaped interrogation were relevant and admissible. Without the officers' statements and questions, the meaning and significance of defendant's answers, comments, behaviors—or even, at times, his silence—would be difficult to discern.

¶ 50   We note defendant cites several examples of the investigating officers' statements, which he maintains were improper and not helpful in providing context for his statements. We disagree. Defendant notes that Daniels commented on photographs of N.W. that showed "welts *** with scabs" that had "actually bled." This line of questioning from Daniels initially elicited a statement from defendant that N.W. had scratched himself; however, defendant ultimately described spanking N.W. with a "folded belt" and stated that maybe he used the "wrong type of belt." After defendant suggested N.W.'s injuries may have been created or enhanced by makeup, Daniels responded that the photos were taken at the hospital and "[d]efinitely not makeup." Defendant then agreed that the photographs "looked bad" and "looked like abuse."

¶ 51   Defendant next points to statements and questioning by the officers regarding whether defendant minimized his conduct and used an extension cord to discipline N.W. During that portion of the interrogation, defendant described spanking N.W., estimated how many "missed shots" landed on N.W.'s arm, stated he "made a mistake" and needed "counseling" on how to discipline, stated he used a blue belt made of "thin leather" when spanking N.W., stated he "maybe popped [N.W.] a little too hard," and demonstrated how he used a belt to "pop" N.W. Finally, during the portion of the interrogation in which defendant asserts Daniels "summarized" what eventually became the State's case, defendant agreed that the marks on N.W. were caused by "the belt" rather than something else.

¶ 52   Ultimately, the record does not support defendant's assertion on appeal that he "barely responded to the officers' aforementioned comments." Rather, he made statements indicating he was responsible for N.W.'s injuries and contradicting the defenses he presented at trial. As discussed, the officers' statements helped to demonstrate the effect their questioning had on defendant and to explain his subsequent statements.

¶ 53   To support his position that the officers' interrogation statements were irrelevant and unduly prejudicial, defendant relies heavily on the Third District's decision in *Hardimon*. However, we find that case is factually distinguishable.

¶ 54   In *Hardimon*, the defendant argued his trial counsel was ineffective for failing to file a motion to redact a video recording of the defendant's police interview. *Id.* ¶ 32. Specifically, the defendant maintained "that the final two-thirds of the video recording should have been redacted because it was irrelevant and more prejudicial than probative." *Id.* The appellate court agreed with the defendant's argument. *Id.* ¶ 37.

¶ 55   In so holding, the Third District described the first one-third of the defendant's interview with detectives as being "arguably relevant," in that it consisted of a conversation between the defendant and the detectives about the defendant's whereabouts and knowledge of the alleged

offense—a shooting at a club. *Id.* ¶¶ 36-38. However, the court noted that the interview then shifted "from a conversational tone to accusations" and that, during the remaining two-thirds of the recording, the defendant adamantly and consistently denied the accusations against him. *Id.* ¶ 36. Despite the defendant's denials, the detectives "goaded" the defendant into confessing by suggesting he would receive more lenient treatment if he took responsibility, commenting that the evidence weighed heavily against the defendant and the prosecution could easily prevail at trial, commenting on possible media attention the defendant would receive, assuring the defendant they were not lying, indicating the defendant's failure to implicate himself would prevent him from seeing his son, and stating the defendant was going to jail for first degree murder. *Id.* The court concluded as follows:

> "[The] comments from the interviewing officers served only to impermissibly bolster the State's case and inflame the passions of the jury. Because the defendant was adamant that he was not involved in the shooting and did not change his version of events throughout the interview, the final two-thirds of the interview had no probative value. Rather, this portion of the video was highly prejudicial and, at times, removed the finding of guilt from the province of the jury as the detectives conclusively stated that the defendant was guilty of murder." *Id.* ¶ 37.

¶ 56    Defendant likens his case to *Hardimon* by arguing he made no relevant statements or admissions after approximately the 18-minute mark of the interrogation video and, as a result, "the remaining 35 minutes or so" of the interrogation held no relevance or probative value. We disagree and find the record belies this assertion. Certainly, the initial portion of the interrogation video contains relevant admissions by defendant. However, thereafter, defendant continued to make relevant statements, implicating himself in the crime and contradicting the defenses he made at trial. Significantly, the interrogation video shows defendant admitted that he might have gone "overboard" in his discipline (24:54), admitted he caused the "circular marks" on N.W. with the "end of the belt" (29:17), estimated how many "missed shots" struck N.W.'s left arm (33:49), admitted he made a "mistake" (35:15), admitted that he spanked N.W. with a blue belt made of "thin leather" (35:40), stated he might have "popped" N.W. "too hard" (37:40), admitted "most" of the marks on N.W. were from "being spanked" (39:50), described how N.W. received welts on the inside of his leg (41:10), and admitted that the injuries to N.W. were inflicted at "different times" (44:30).

¶ 57    In *Hardimon*, the officers' statements amounted to persistent accusations in the face of the defendant's equally persistent denials. The statements, therefore, held no probative value and were not helpful to the trier of fact. Unlike in *Hardimon*, defendant in this case, continued to make incriminating statements that held probative value. As a result, *Hardimon* is not dispositive of the issue presented here and does not warrant a finding that the final "35 minutes or so" of the interrogation video should have been excluded from the evidence.

¶ 58    As indicated, defendant also argues that the officers' videotaped statements constituted improper lay witness opinions on defendant's credibility and the strength of the State's case. However, our supreme court has held that statements of past opinions, rather than present ones, do not constitute improper lay opinion testimony. *Hanson*, 238 Ill. 2d at 101; see also *People v. Moore*, 2012 IL App (1st) 100857, ¶ 52, 964 N.E.2d 1276 (holding that where an officer's statement "is not a current comment on the defendant's credibility [citation], the police accusations may be seen as a standard interrogation tactic, rather than an improper opinion on [the defendant's] credibility"). In this instance, the officers' statements—recorded on the

interrogation video—were not testimony. Moreover, defendant has failed to point to any statements of *present* opinion from the investigating officers.

¶ 59    Under our analysis as set forth above, because the officers' statements and questions during defendant's interrogation were helpful to the jury so as to place defendant's statements (and his silence) into context and because their probative value outweighed their prejudicial effect, we find they were properly admitted.

¶ 60    Finally, we note that, here, defendant argues only first-prong plain error. In such cases, "a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. In this instance, even if we were to find that clear and obvious error occurred, defendant cannot otherwise establish first-prong plain error. In other words, the evidence at defendant's trial was not closely balanced; rather, the State presented substantial evidence of his guilt.

¶ 61    As stated, defendant acknowledges that his own statements in the interrogation video were properly admitted against him. During the interrogation, defendant admitted spanking two-year-old N.W. with a blue belt made of "thin leather" on his bare buttocks. N.W. "squirmed" or moved around during spankings, which caused defendant to strike N.W.'s arm, hand, and legs. Defendant admitted that his spankings caused "welts" and "circular marks" on N.W.'s body. When shown photographs of the marks on N.W., defendant admitted that spanking caused "most" of the marks. He also acknowledged that the marks or injuries occurred at "different times," that he went "overboard" in his discipline, and that N.W.'s injuries "looked bad."

¶ 62    The State also presented several photographs depicting N.W.'s injuries, including photographs of his arm, back, and legs. The photographs showed welts or circular marks on N.W.'s body, some of which appeared to have bled and were scabbed over. Dr. Leon testified N.W.'s injuries consisted of bruising and what appeared to be "belt marks." He estimated the injuries were inflicted "within a few days" and opined they were "consistent with being whipped with a cord or a belt."

¶ 63    Although defendant attempted to show that N.W.'s injuries were the result of a car accident, caused by Laura, or the result of reasonable discipline, his videotaped statements contradicted those arguments. Further, testimony from defendant's own witnesses regarding N.W.'s car accident injuries varied greatly. The only real support for defendant's argument that N.W.'s injuries were the result of the car accident came from defendant's father, Luther. However, Luther's testimony was contradicted by defendant's other witnesses who either observed no injuries to N.W. after the car accident or only minor injuries that were not consistent with the photographic evidence. Additionally, Lundy, the officer who investigated the car accident, also contradicted Luther's testimony, indicating N.W. had "no visible injuries" following the accident.

¶ 64    Contrary to defendant's assertions, evidence of his guilt was strong and not closely balanced. As a result, he cannot establish that the error he alleges in the admission of the officers' statements "alone severely threatened to tip the scales of justice," and he has failed to demonstrate plain error.

## B. The State's Impeachment of a Defense Witness

On appeal, defendant also argues the State improperly impeached Luther and, as a result, misled the jury about Luther's prior statement. However, defendant also failed to preserve this issue for appellate review. Again, he maintains that this court may excuse his forfeiture because the alleged error was clear or obvious and the evidence was closely balanced. For the reasons discussed above, the evidence presented was not closely balanced. Rather, the State presented substantial evidence of defendant's guilt. Therefore, even if we assume that a clear or obvious error occurred with respect to the State's impeachment of Luther, defendant cannot demonstrate first-prong plain error.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

Affirmed.