NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180479-U

NO. 4-18-0479

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 20, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| DEVOE D. RANDALL, | ) | No. 17CF1037 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey S. Geisler, |
| | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court affirmed, concluding defendant failed to establish either plain error or ineffective assistance of trial counsel.

¶ 2    Following a jury trial, defendant, Devoe D. Randall, was convicted of aggravated battery with a firearm, aggravated discharge of a firearm, and being an armed habitual criminal. At sentencing, the trial court merged the aggravated discharge of a firearm conviction into the aggravated battery with a firearm conviction and then sentenced defendant to two concurrently imposed terms of 14 years' imprisonment.

¶ 3    Defendant appeals, arguing (1) plain error occurred, or his trial counsel provided ineffective assistance by failing to object, when two police officers provided lay-witness identification testimony that a man seen inside a car wash was defendant and that defendant was

wearing a certain type of undershirt; (2) his trial counsel provided ineffective assistance by failing to (a) ensure the potential jurors were examined about their prejudices against street gang affiliation and activity and (b) seek the redaction of those portions of his recorded police interview when the officer gave inadmissible and prejudicial lay-witness opinions that defendant was a liar and that defendant was the man seen inside the car wash; and (3) plain error occurred, or his trial counsel provided ineffective assistance by failing to object, when the trial court relied upon factors inherent in the offenses for which he was convicted in reaching its sentencing decisions.

¶ 4        For the reasons that follow, we find defendant has failed to establish either plain error or ineffective assistance of trial counsel and, therefore, affirm the trial court's judgment.

¶ 5                              I. BACKGROUND

¶ 6                              A. Information

¶ 7        In July 2017, the State charged defendant by information with attempt (first degree murder) (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)) (count I), aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2010)) (count II), aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)) (count III), and being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2016)) (count IV). The charges stemmed from a shooting incident occurring during the early morning hours of July 9, 2017, at a gas station located at 2185 East Wood Street in Decatur (the gas station). The incident resulted in Marlone Dishman sustaining gunshot wounds to his knee.

¶ 8                              B. Jury Trial

¶ 9        In February 2018, the trial court conducted a jury trial. During *voir dire*, the potential jurors were not examined concerning any bias they may have had against street gang

affiliation and activity.

¶ 10        Marlone Dishman testified, around 2:45 a.m. on July 9, 2017, he, along with several other people, were at the gas station. He did not argue with anyone that night, nor did anyone make threats towards him. At one point, he was shot in the knee while he was standing by the gas pumps with his relatives, Javaris and Jerrin Milan. He did not see who shot him or what direction the shots came from. He did not hear more than one shot being fired. He was taken by car to the hospital, where he spent one night and had surgery on his knee. On cross-examination, Dishman testified neither he nor his friends had any affiliation with a group known as "Moes" or "Eastside Boys." He also testified he did not know why anyone would have a reason to shoot at him and he did not have any problems with anyone.

¶ 11        Jazmyne Milan testified she was at the gas station with her brother, Dishman, as well as her relatives, Javaris and Jerrin, and some friends. While she was standing by an air pump, she heard gunshots, approximately seven or eight, and then saw her brother had been shot. She saw the shooter come from the gas station's car wash. She recalled the shooter was a black male who had a red scarf or bandana covering his face and was wearing a white undershirt and dark blue or black "sweats." After the shooting, Jazmyne left in a car and called the police. She then spoke to a police officer later that night and gave the officer the names of people who had been at the gas station. Jazmyne later identified the shooter during a recorded police interview as "Dontaeveous Williams," whom she recognized from the tattoos he had on his face. Jazmyne testified nothing blocked her view of the shooter but acknowledged she could not tell exactly who the shooter was because most of his face was covered. She did not know why her brother was shot. On cross-examination, Jazmyne testified her brother was not in a gang. She further testified the

officer she spoke with identified defendant as a suspect.

¶ 12     The State published to the jury a stipulation concerning the testimony of Larry Faulkener. According to the stipulation, on July 9, 2017, Faulkener was working as the clerk at the gas station. At approximately 2:50 a.m., he heard 10 to 15 gunshots from the station's parking lot, a pause, and then approximately 10 more gunshots. An injured black man was then brought into the store by a group of people who asked Faulkener not to call the police. The group then carried the man out of the store. Faulkener later gave a police officer access to the gas station's surveillance system.

¶ 13     Police officers Peter Hackleman and Jason Danner both testified they attempted to interview Dishman at a hospital at different times on the morning of July 9, 2017. Dishman was uncooperative and did not give any information. Officer Danner arrived while Dishman was being treated and saw he appeared to have two gunshot wounds in his left knee. Officer Danner was unable to photograph the wounds because Dishman put his hands over his knee. Officer Danner explained a photograph was of Dishman being wheeled into the emergency room at approximately 2:55 a.m. that morning.

¶ 14     Police officers Megan Welge and Malcolm Livingston processed the scene at the gas station. Officer Welge testified about a series of photographs she took showing the location of bullet fragments, shell casings, and impact damage. She also saw, photographed, and collected a sample from a drop of blood just inside the store of the gas station. Officer Livingston collected shell casings with gloves to preserve prints. He did not know if any collected casings were sent to be tested for prints.

¶ 15     Officer Welge found a bullet fragment between gas pumps in front of the gas

station's entrance, which she photographed and then collected as evidence. On the side of the store, to the left of its entrance, there were multiple shell casings on the ground and a defect in the station wall that appeared to be from a gunshot. To the left of the defect in the wall, further away from the store's entrance, was the entrance to the car wash. There were several shell casings in that area. Officer Welge testified several 9-millimeter casings were found inside the car wash and just outside of it, while some .45-caliber casings were located closer to the entrance of the gas station. She also saw shell casings among hoses just inside the car wash and photographed an apparent casing in the drain path of the car wash. She did not know if any fingerprint tests were done on the collected casings. She agreed the group of the two different types of casings suggested it was not a situation where one person had two different guns.

¶ 16        The State published to the jury a stipulation concerning the testimony of Chad Cravens. According to the stipulation, Cravens was the assistant manager of the gas station. Cravens, who had been trained in the function and operation of the gas station's surveillance system, observed the system was in working order and had been recording from all cameras from 2 a.m. to 4 a.m. on July 9, 2017. Video footage from the cameras was preserved on the station's server and had not been altered or compromised. Cravens downloaded the video footage to DVDs. The video footage on the DVDs provided a fair and accurate representation of the video on the server from July 9, 2017, between the hours of 2 a.m. and 4 a.m. Cravens gave the DVDs to a police detective.

¶ 17        Officer Robert Hoecker testified he responded to the gas station shortly after the shooting and reviewed video footage from the gas station's surveillance system to find footage relevant to the investigation. The surveillance system had multiple cameras covering the exterior

and interior of the area. Officer Hoecker's knowledge of the approximate time frame of the shooting and the location of shell casings influenced the cameras and times on which he focused. He prepared a written report detailing the footage from various cameras and times which he thought was relevant.

¶ 18　　　　The State played about a dozen video clips for the jury, and Officer Hoecker described what he found relevant in those clips. The video clips came from People's Exhibit 1, which was two DVDs containing surveillance footage from the gas station's sixteen security cameras. Each clip contains the camera number, the year, the date, and the time. In addition to Dishman, Officer Hoecker identified three men in the video clips whom he called suspect one, suspect two, and suspect three. He believed only suspect one was "relevant" to the shooting of Dishman.

¶ 19　　　　Officer Hoecker described suspect one as a black man with a red t-shirt with white writing on the chest, logos on the sleeves, black shorts, white and black tennis shoes, and a green wristband on his right hand. Officer Hoecker testified the video clips showed suspect one talking to several women and another man who wore black pants, a red shirt, and white and black shoes on the north side of the station's parking lot. Suspect one then went into the store to purchase a bottle of water, left the store, and walked to the south end of the parking lot, and finally returned to the north end of the parking lot, where the women who previously spoke with suspect one were located. At one point, suspect one walked past Dishman, who was with suspects two and three.

¶ 20　　　　Officer Hoecker testified suspect one walked westbound off camera toward the car wash exit. Approximately 90 seconds after suspect one walked west off camera, a man could be seen on camera walking through the interior of the car wash. Officer Hoecker testified, "So now I

can't describe that per se as suspect one as the outfit has changed, but there were several characteristics that matched suspect one's description." Specifically, Officer Hoecker noted suspect one and the man in the car wash had similar shoes, shorts, and a watch or wristband on the right hand. Officer Hoecker also testified the man in the car wash appeared to have a red shirt like suspect one, which was wrapped around the man's face. On cross-examination, Officer Hoecker was asked if he previously testified suspect one was the man inside the car wash, to which Officer Hoecker testified, "I could not 100 percent confirm suspect one as the outfit had changed but the same characteristics of suspect one, yes."

¶ 21　　　　Officer Hoecker testified the man in the car wash drew a weapon from his waistband and went to the entrance of car wash, raised his hand, and went off camera. At that time, suspects two and three, Dishman, and others ran and ducked. Dishman then could be seen falling outside of the entrance of the store. The man originally seen in the car wash then returned to the car wash walking in the opposite direction. Officer Hoecker described suspect three handing something to suspect two, who then ran to the entrance of the car wash and pointed a handgun toward the car wash exit. Hoecker described how Dishman was then brought into the store and then carried to a car.

¶ 22　　　　Detective Jason Hesse, a detective with the street crimes unit, testified it was common in the Decatur Police Department to send out department-wide emails with photographs asking for assistance to identify someone. He received such an email around July 9, 2017, and identified defendant from a still photograph taken from the surveillance footage inside the store of the gas station. He identified defendant in two additional photographs from inside the gas station but did not remember if he had seen those photographs with the original email. On

cross-examination, Detective Hesse was asked about if he was shown a still photograph of an individual walking through a car wash, to which he stated he vaguely remembered looking at a photograph of someone walking through a car wash but he could not identify that person based on facial features.

¶ 23    Detective Timothy Wittmer testified as part of the investigation he reviewed all the initial reports and video clips from the surveillance cameras that had been gathered. He reviewed the video clips to put together a narrative of the timeline of events as they occurred, as well as to identify individual suspects and note their involvement in the reported shooting. He noted the clips contained "very high quality surveillance footage." Through his review of the clips, Detective Wittmer was able to identify the individuals previously identified as suspects two and three as Jerrin and Javaris Milan based on his previous police contacts with them.

¶ 24    Detective Wittmer also took screenshots while watching the video clips. The still photographs are not as clear as the footage in the video clips. To identify the individual previously identified as suspect one, Detective Wittmer sent a department-wide email with still photographs of suspect one. He learned Detective Hesse was able to identify suspect one as defendant. Detective Wittmer identified several still photographs of the screenshots made from the video clips as showing defendant outside and inside the store of the gas station. Detective Wittmer testified in certain photographs an outline of a tank top style undershirt can be seen underneath defendant's red t-shirt.

¶ 25    The jury was shown two still photographs of screenshots made from the surveillance footage from inside the car wash. The photographs depict a man in the car wash walking toward the car wash entrance and exit. Detective Wittmer testified he found the

photographs significant in his investigation because it showed the man in the car wash and defendant wearing similar shoes, clothing, and wristbands. With respect to the shoes, Detective Wittmer noted not only were the shoes similar in style but the Velcro straps on the shoes were being worn in a similar manner. Detective Wittmer further testified he did not observe any other patron at the gas station to be wearing similar clothing during his review of the video clips.

¶ 26        After familiarizing the jury with the layout of the area around the gas station with an overhead map, Detective Wittmer narrated to the jurors what they saw on approximately 15 different video clips from different cameras. When discussing the video clips that showed defendant walk south and then north by the gas pumps, Detective Wittmer agreed with the prosecutor that two groups were seen on the clip and stated Dishman was "affiliated" with the Milans' group because he was related to them. He further narrated the clips showing defendant speaking with a group of women and then walking south, defendant entering the store, defendant purchasing a bottle of water, Dishman falling outside the store's entrance, and Dishman being brought into the store.

¶ 27        Detective Wittmer narrated two video clips containing surveillance footage from inside the car wash, telling the jurors "the suspect" drew a handgun from his waistband, faced towards the store, and the handgun had its slide to the rear as if it was in the process of firing. Next, "the suspect" walked back through the car wash and placed the handgun in his waistband. When asked on direct examination what occurred after the suspect walked back through the car wash, Detective Wittmer testified, "you're going to see here is Jerrin Milan firing back a handgun firing at Mr. Randall [(defendant)] as he's exiting the carwash."

¶ 28        On redirect examination, the following inquiry occurred:

"Q. Now, you were asked about the clipboard in the bottom corner you could see the defendant's hand raised and the gun it appeared to be in the process of firing, mid firing?

A. Correct.

Q. When that clip continued to play, did the defendant's hand move out of the line of sight of the camera?

A. Throughout that clip, the—the defendant is not in view the entire time, no. There was some time before you'll notice he goes off camera for several seconds, and then he comes back and as he's coming back, that's when that other—when it was paused so there was a brief period of time where you could see him off camera.

A. So he's moving—

Q. That he was off camera, excuse me

[TRIAL COUNSEL]: Objection. I don't know how you see somebody off camera.

THE COURT: I'm going to sustain the objection

Q. Is it accurate to say that the defendant was moving as he was firing the gun?

A. Yes."

¶ 29 Detective Wittmer testified he issued a "person's wanted" for Jerrin and Javaris Milan as well as defendant and then interviewed defendant on July 18, 2017. The interview was recorded. An audio and video recording was entered into evidence and played for the jury. The

recording is approximately eight minutes in length. In the first three minutes of the recording, defendant confirmed he was at the gas station, Detective Wittmer showed defendant photographs on his cell phone which were purportedly taken from the surveillance system of the gas station, and defendant denied he was the man seen inside the car wash. In the next thirty seconds, defendant told Detective Wittmer he left the gas station and was at his cousin's house on Wood Street at the time of the shooting. At various points during the remainder of the interview, Detective Wittmer stated defendant was lying to him, he did not believe defendant, he was not stupid, defendant fired gunshots and struck a person in the knee, defendant's insistence it was not him on camera was absurd, and defendant was depicted in the photographs on his cell phone. In response to Detective Wittmer's statements, defendant maintained he was not the shooter, provided an explanation of what he was doing at his cousin's house and the other individuals who were present at the house, and asserted he did not return to the gas station after he went to his cousin's house.

¶ 30    When questioned about the recording, Detective Wittmer testified a dispute between two groups of people which he mentioned during the interview was in reference to an ongoing feud between the "Moes" and the "Eastside." Detective Wittmer testified Dishman was a documented member of the Moes and Jerrin Milan was a gang associate. He also testified he recognized Dontaeveous Williams, who was affiliated with the Eastside, when reviewing the video clips of the surveillance footage. Detective Wittmer did not recall any interaction between Williams and defendant. Detective Wittmer further testified he could not say if defendant was known to associate with anyone with the Eastside.

¶ 31    On cross-examination, Detective Wittmer was examined about his investigation into Williams. He made several attempts to call Williams and visit him at his last known address,

- 11 -

all of which were unsuccessful. After a few days, he stopped his attempt to contact Williams as he believed Williams was not involved in the shooting. Detective Wittmer testified he did not have any of the recovered shell casings sent for fingerprint testing because the discovery of useable prints from a casing was rare. Detective Wittmer explained he intentionally shouted and cursed during the defendant's interview as part of an interviewing technique, not because he lost control. He acknowledged he was angry at the time given the nature of the crimes and the crimes repeated occurrence in Decatur.

¶ 32    The State introduced evidence of two of defendant's prior convictions. The jury was informed defendant had been convicted of unlawful possession of a controlled substance with intent to deliver in case No. 08-CF-554 and of unlawful delivery of a controlled substance in case No. 13-CF-1189.

¶ 33    In closing, the State focused on the video clips of the surveillance footage. The State argued defendant was the man seen inside the car wash. In support, the State focused on the similar gait and appearance of both individuals as well as the fact the man in the car wash appeared approximately 90 seconds after defendant could no longer be seen on camera. With respect to the appearance, the State highlighted both individuals wore distinctive multicolored Nike shoes that had a swoosh and large Velcro tab on top, dark shorts, similarly styled undershirts, and wristbands. The State also highlighted defendant was wearing a bright red t-shirt and the man in the car wash had wrapped around his face what appeared to be a t-shirt of the same color. The State also focused on the actions of defendant before the shooting, noting he briefly spoke with a group of women whom he had previously spoken to and those women then quickly left before defendant headed towards the car wash. As to a possible motive for his actions, the State suggested defendant may

- 12 -

have "wanted to escalate the ongoing feud between the two groups that [D]etective Wittmer told you about," "thought he could impress someone," or "wanted to impress some of the women that he had been talking to[.]"

¶ 34 In response, the defense argued this was a case of mistaken identity caused by an inadequate investigation. The defense asserted the evidence pointed towards Williams as opposed to defendant. The defense maintained the State did not provide a motive for why defendant would have committed the shooting. With respect to the State's suggestion that defendant may have wanted to escalate the ongoing feud between the two groups, the defense asserted there was no evidence of defendant being part of one of those groups. The defense alternatively argued, to the extent the jury accepted such a motive, any consistencies in the clothing of defendant and the man in the car wash were not determinative as members of gangs commonly wore similar clothing.

¶ 35 Following deliberations, the jury returned verdicts finding defendant guilty of counts II, III, and IV. Because the jury indicated it was unable to reach a unanimous verdict on count I, the trial court declared a mistrial on that count.

¶ 36 C. Posttrial Motion

¶ 37 In May 2018, defendant filed a motion for a new trial, raising various complaints unrelated to those made in this appeal. Following a hearing that same month, the trial court denied defendant's motion.

¶ 38 D. Sentencing

¶ 39 In July 2018, the trial court held a sentencing hearing. The court merged the aggravated discharge of a firearm conviction into the aggravated battery with a firearm conviction and ordered it to be served concurrent to the armed habitual criminal conviction. The court received

- 13 -

a presentence investigation report and several letters from defendant's family and friends. Defendant declined to give a statement in allocution.

¶ 40    The State recommended defendant receive middle-range sentences, while the defense recommended defendant receive lower-range sentences. The State, in support of its recommendation, asserted defendant was lucky no one was killed when he opened fire in a public place and middle-range sentences would serve to deter others from committing similar crimes in Decatur.

¶ 41    In the oral pronouncement of its decision, the trial court stated it considered the evidence and recommendations presented as well as the statutory factors in aggravation and mitigation. As to statutory factors in aggravation, the court stated:

"As I look at the factors in aggravation, I don't have to look any further than what happened in this case. A person was shot, had to go to the hospital.

I do look at the prior criminal history, of course, the 08-CF-554 and the 13-CF-1189 are factored into the armed habitual criminal. But I do look that as a juvenile, he does have [a] prior record, an aggravated battery. He does have other record other than what is part of the armed habitual case so he does have a prior criminal history in this matter. Certainly there is a need for a deterrent.

The Court was present during the testimony of the trial. Somebody who is shooting a gun in a public place in Macon County,

- 14 -

as the State has stated, is not something that the People of Decatur

should tolerate. I do believe a message needs to be sent to the public.

A sentence in the minimum range is not appropriate given the facts

and circumstances the Court has in front of it."

The court sentenced defendant to two concurrently imposed terms of 14 years' imprisonment.

¶ 42         This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44         On appeal, defendant argues (1) plain error occurred, or his trial counsel provided ineffective assistance by failing to object, when Detective Wittmer and Officer Hoecker provided lay-witness identification testimony that the man seen inside the car wash was defendant and that defendant was wearing a certain type of undershirt; (2) his trial counsel provided ineffective assistance by failing to (a) ensure the potential jurors were examined about their prejudices against street gang affiliation and activity and (b) seek the redaction of those portions of his recorded police interview when Detective Wittmer gave inadmissible and prejudicial lay-witness opinions that defendant was a liar and that defendant was the man seen inside the car wash; and (3) plain error occurred, or his trial counsel provided ineffective assistance by failing to object, when the trial court relied upon factors inherent in the offenses for which he was convicted in reaching its sentencing decisions. In response, the State asserts each of defendant's arguments are meritless.

¶ 45                        A. Lay-Witness Identification Testimony

¶ 46         Defendant argues plain error occurred or his trial counsel provided ineffective assistance by failing to object when Detective Wittmer and Officer Hoecker provided lay-witness

identification testimony that the man seen inside the car wash was defendant and that defendant was wearing a certain type of undershirt.

¶ 47 The plain-error doctrine provides a "narrow and limited exception" allowing courts of review to address forfeited claims. *People v. Reese*, 2017 IL 120011, ¶ 72, 102 N.E.3d 126. Under the plain-error doctrine, a reviewing court may disregard a defendant's forfeiture and consider an unpreserved claim of error where:

> " '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007)).

Under both prongs of the plain-error doctrine, the defendant bears the burden of persuasion. *People v. Wilmington*, 2013 IL 112938, ¶ 43, 983 N.E.2d 1015.

¶ 48 Forfeited claims may also be addressed as a matter of ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of counsel, it must be shown both (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

- 16 -

proceeding would have been different. *People v. Simpson*, 2015 IL 116512, ¶ 35, 25 N.E.3d 601. The defendant bears the burden of persuasion of satisfying both prongs. *Id.*

¶ 49 Under either theory, we must determine whether error occurred. Under the plain-error doctrine, the first step is to determine whether a clear or obvious error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19, 984 N.E.2d 475. Similarly, to succeed on a claim of ineffective assistance of counsel, a defendant must show an error by counsel which was so serious that counsel cannot be said to have been functioning as the counsel guaranteed by the sixth amendment. *People v. Perry*, 224 Ill. 2d 312, 342, 864 N.E.2d 196, 214-15 (2007).

¶ 50 Lay-witness identification testimony is admissible under Illinois Rule of Evidence 701 (eff. Jan. 1, 2011) if "(a) the testimony is rationally based on the perception of the witness and (b) the testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue." *People v. Thompson*, 2016 IL 118667, ¶ 50, 49 N.E.3d 393. Testimony is "rationally based on a witness's perception if the opinion is 'one that a layperson could normally form from observed facts.' "*People v. Gharrett*, 2016 IL App (4th) 140315, ¶ 72, 53 N.E.3d 332 (quoting Michael H. Graham, Graham's Handbook of Illinois Evidence § 701.1, at 618 (10th ed. 2010)). Testimony is helpful to a clear understanding of the witness's testimony or a determination of a fact in issue if there is some basis for concluding the witness is more likely to correctly identify the person or object depicted in surveillance footage than the jury. *Thompson*, 2016 IL 118667, ¶ 50 (identity of a person); *Gharrett*, 2016 IL App (4th) 140315, ¶ 76 (identify an object). In determining whether a witness's opinion as to the identity of a person or object is helpful, we apply a totality of the circumstances approach. *Thompson*, 2016 IL 118667, ¶ 51 (adopting such an approach and setting forth several factors to consider in determining whether there is some basis

- 17 -

for concluding the witness is more likely to correctly identify the defendant); *Gharrett*, 2016 IL App (4th) 140315, ¶ 77.

¶ 51　　　　First, defendant complains Officer Hoecker provided inadmissible lay-witness identification testimony that the man seen inside the car wash was defendant. We disagree. Officer Hoecker never identified the man seen inside the car wash as defendant. In fact, Officer Hoecker never even identified the man seen inside the car wash as suspect one. Defendant cites Officer Hoecker's testimony indicating he believed "suspect one" was the only suspect "relevant" to the shooting of Dishman. Officer Hoecker's belief that suspect one was the only suspect relevant to the shooting of Dishman does not, however, constitute lay-witness identification testimony that the man seen inside the car wash was defendant. See *Thompson*, 2016 IL 118667, ¶¶ 8, 61 (law enforcement officer's testimony describing the actions of "the subject" in the surveillance recording did not identify the defendant as the individual depicted in the recording and thus was not lay-witness identification testimony).

¶ 52　　　　Next, defendant complains Detective Wittmer provided inadmissible lay-witness identification testimony that defendant was wearing a certain type of undershirt. We disagree. Detective Wittmer's opinion was based on his perception of the surveillance footage, which he reviewed in detail as part of his investigation. See *Gharrett*, 2016 IL App (4th) 140315, ¶ 72 ("An opinion as to what a video depicts is an opinion that a layperson could normally form from observing the video.") Detective Wittmer's opinion was also helpful to the determination of a fact in issue—whether the man seen inside the car wash was defendant. The man in the car wash disguised his face with what appeared to be a t-shirt and was wearing a tank top style undershirt. It was difficult to recognize in the surveillance footage whether defendant was wearing an

undershirt and what kind. Detective Wittmer's review of the surveillance footage allowed him to point out an issue that may have gone unnoticed by the jury.

¶ 53         Last, defendant complains Detective Wittmer provided inadmissible lay-witness identification testimony that the man seen inside the car wash was defendant. We agree. While Detective Wittmer largely avoided identifying the man seen inside the car wash as defendant on direct-examination, he did so when he described Jerrin Milan firing a handgun "at Mr. Randall [(defendant)] as he's exiting the carwash." The State then, on redirect examination, made clear to the jury that Detective Wittmer believed the man seen inside the car wash was defendant. This lay-witness identification testimony was improper. As Detective Wittmer noted, the surveillance footage was of high quality. Through the footage, the jury could observe defendant and easily identify his shoes, clothing (except for his undershirt), and gait. The jury could also observe the man in the car wash and easily identify his shoes, clothing, and gait. The lay-witness identification testimony offered by Detective Wittmer was not helpful to a clear understanding of the detective's testimony or a determination of a fact in issue. Accordingly, we find the testimony was inadmissible and trial counsel should have objected to its introduction.

¶ 54         Defendant contends the introduction of Detective Wittmer's inadmissible lay-witness identification testimony that the man seen inside the car wash was defendant tipped the scales of justice against him as the evidence was closely balanced or, alternatively, there is a reasonable probability that, but for trial counsel's failure to object to the testimony, the result of the proceeding would have been different. We disagree. The issue of whether the man inside the car wash was defendant was not close. Both defendant and the man inside the car wash wore the same multi-colored Nike shoes. The Velcro tab on top of the shoes worn by both individuals was

- 19 -

not connected and moved with physical activity. Both defendant and the man inside the car wash wore the same clothing and wristbands. Defendant was wearing a bright red t-shirt and the man in the car wash had wrapped around his face a t-shirt of the same color. Both individuals had a similar gait. Shortly before the shooting, defendant briefly spoke with a group of women who then quickly left before defendant headed towards the car wash. Approximately 90 seconds after defendant could no longer be seen on camera, the man in the car wash appeared. The evidence made clear defendant was the man inside the car wash. Even if trial counsel had objected to the testimony, we find there is no reasonable probability the result of the proceeding would have been different.

¶ 55                                    B. *Voir Dire* Examination

¶ 56          Defendant argues his trial counsel provided ineffective assistance by failing to ensure the potential jurors were examined about their prejudices against street gang affiliation and activity.

¶ 57          Criminal defendants have a constitutional right to a trial by a fair and impartial jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Our supreme court has held, "[W]hen testimony regarding gang membership and gang-related activity is to be an integral part of the defendant's trial, the defendant must be afforded an opportunity to question the prospective jurors, either directly or through questions submitted to the trial court, concerning gang bias." *People v. Strain*, 194 Ill. 2d 467, 477, 742 N.E.2d 315, 321. This is because jurors may hold a "strong prejudice against street gangs." *Id.*

¶ 58          Based on the record before us, we are unconvinced trial counsel's failure to ensure the potential jurors were examined about their prejudices against street gang affiliation and activity constituted objectively unreasonable performance. As trial counsel pointed out during closing

argument, there was no evidence at trial indicating defendant had any street gang affiliation or activity. There was, however, evidence indicating the victim, Dishman, was a member of a gang, which had an ongoing conflict with another gang. There was also evidence indicating a member of the other gang, Williams, was present at the gas station and had been identified as the man seen inside the car wash. Given this evidence, trial counsel could have reasonably concluded as a matter of trial strategy that any prejudice against gang members would have operated against the State as opposed to defendant.

¶ 59                    C. Audio and Video Recorded Police Interview

¶ 60          Defendant argues his trial counsel provided ineffective assistance by failing to seek the redaction of those portions of his recorded police interview when Detective Wittmer gave inadmissible and prejudicial lay-witness opinions that defendant was a liar and that defendant was the man seen inside the car wash.

¶ 61          Generally, questions or statements by a police officer made during an interview of a defendant will be admissible if (1) the officer's questions or statements will be helpful to the jury so as to place the defendant's responses (or lack thereof) into context and (2) the prejudicial effect of the officer's questions or statements do not substantially outweigh their probative value. *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 48, 103 N.E.3d 1096.

¶ 62          Based on the record before us, we are unconvinced trial counsel's failure to seek the redactions of defendant's recorded police interview constituted objectively unreasonable performance. Initially, we note any statements of past opinions do not constitute lay-witness opinion testimony. *People v. Hanson*, 238 Ill. 2d 74, 101, 939 N.E.2d 238, 254 (2010). The defense, through its cross-examination and closing argument, presented its theory that this was a

case of mistaken identity caused by an inadequate investigation. The playing of the entirety of the eight-minute interview supported the defense's theory—it showed a detective who appeared upset and was shouting and cursing. Given the theory of defense, trial counsel could have reasonably concluded as a matter of trial strategy that any prejudicial effect of the detective's statements did not substantially outweigh their probative value to the defense.

¶ 63        In reaching this decision, we find defendant's reliance upon *People v. Hardimon*, 2017 IL App (3d) 120772, 77 N.E.3d 1184, unpersuasive as that case is factually distinguishable. In *Hardimon*, the appellate court found a defendant received ineffective assistance due to his trial counsel's failure to seek the redaction of a portion of a recorded police interview which was irrelevant and more prejudicial than probative. *Id.* ¶ 37. In so finding, the court found the officer's statements made during the complained-of portion of the interview "served only to impermissibly bolster the State's case and inflame the passions of the jury." *Id.* Unlike *Hardimon*, trial counsel in this case presented a theory of an inadequate investigation and the statements of the detective supported that theory. *C.f. id.* ¶ 27.

¶ 64                              D. Sentencing Decisions

¶ 65        Defendant argues plain error occurred, or his trial counsel provided ineffective assistance by failing to object, when the trial court relied upon aggravating factors inherent in the offenses for which he was convicted in reaching its sentencing decisions.

¶ 66        The aggravating factors that may be applied during sentencing is set by statute. *People v. Johnson*, 2019 IL 122956, ¶ 38, 129 N.E.3d 1239; see 730 ILCS 5/5-5-3.2 (West 2016). A factor inherent in the offense cannot be used in aggravation to justify a more severe sentence than might otherwise be imposed. *People v. Saldivar*, 113 Ill. 2d 256, 267, 497 N.E.2d

1138, 1142 (1986). The burden is on the defendant to establish the trial court improperly considered an inherent factor. *People v. Dowding*, 388 Ill. App. 3d 936, 943, 904 N.E.2d 1022, 1028 (2009).

¶ 67    Defendant complains the trial court improperly considered that he possessed a gun and that he fired a gun and someone was hurt as those facts are inherent in the offenses for which he was convicted. We disagree. In reviewing the factors in aggravation, the court stated, (1) "A person was shot, had to go to the hospital" and (2) there was a need for deterrent as "[s]omebody who is shooting a gun in a public place" should not be tolerated. These statements do not establish the court was improperly relying on facts inherent in the offenses for which defendant was convicted. To the contrary, the court's statements indicate the court was considering the degree of harm Dishman suffered and the need to deter others from committing similar crimes in public places. See *Saldivar*, 113 Ill. 2d at 269 ("[T]he commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm."). Defendant has failed to show the trial court committed error in reaching its sentencing decisions.

¶ 68                        III. CONCLUSION

¶ 69    We affirm the trial court's judgment.

¶ 70    Affirmed.